[Crim. No. 3875.   Second Dist., Div. Three.   Oct. 30, 1945.]

THE PEOPLE, Respondent, v. BENNETT R. WESTMIRE et al., Appellants.

Morris Lavine for Appellants.

Robert W. Kenny, Attorney General, and Carl S. Kegley, Deputy Attorney General, for Respondent.

WOOD, J.—In an indictment the defendants were accused of the crimes of attempted rape; robbery, while armed with a deadly weapon; and kidnaping. It was charged therein that defendant Westmire had been convicted twice in California of burglary, a felony, and that defendant Clayton had been convicted twice in California of robbery, a felony. Each defendant pleaded not guilty and admitted the charges of previous convictions. In a jury trial both defendants were found guilty of attempted rape and robbery as charged, and were found not guilty of kidnaping. The trial court adjudged that Westmire was an habitual criminal. It did not determine whether Clayton was an habitual criminal, but referred that matter to the prison board. Defendant Westmire was sentenced on each count to imprisonment in the state penitentiary for life, the sentences to run consecutively. Defendant Clayton was sentenced on each count to imprisonment in the state penitentiary for the period prescribed by law, the sentences to run consecutively. The defendants appeal from the judgments. They contend that the evidence was insufficient, that instructions were erroneous, and that evidence was improperly received.

On May 20, 1944, about 12:30 a. m., while Elizabeth Valenzula and Elvira Moreno were waiting for a bus at Avenue 26 and Figueroa Street in Los Angeles, the defendant Westmire stopped a two-door club-coupe automobile, which he was driving and in which defendant Clayton was riding in the front seat, at the place where the two girls were waiting, and Clayton invited the girls to ride in the automobile. After some conversation as to where the girls were going and where the defendants were going—the girls having said they were going to their homes near Glendale, and Clayton having said that defendants were going to Burbank and that they would take the girls to San Fernando Road and Chevy Chase Boulevard (which was about three blocks from their homes), the girls entered the automobile and sat

in the back seat, after Clayton had tilted the back of the front seat forward so that they could get in. As they proceeded along San Fernando Road for a distance of approximately three miles they were going in a direction which was toward the girls' homes. At Fletcher Drive, Westmire turned the automobile to the right and proceeded in a direction away from the girls' homes, whereupon the girls asked defendants several times to let them out of the automobile. Westmire replied that Clayton "lives up here" and that after he had let Clayton out he (Westmire) would take the girls to Chevy Chase Boulevard. The automobile was not stopped until they had gone to Eagle Rock, a distance of approximately 2½ miles from Fletcher Drive and San Fernando Road. When the automobile stopped at that place, Clayton, while remaining seated in the right front seat, opened the right front door and leaned forward, apparently for the purpose of permitting the girls to get out. Mrs. Moreno, who was sitting back of Clayton, pushed the back of the front seat forward and got out, and then while Mrs. Valenzula was attempting to get out immediately following Mrs. Moreno, Clayton, according to Mrs. Valenzula's testimony, closed the door before she could get out and then hit her on the head with a coca-cola bottle. She testified further that when she was hit she screamed, called Mrs. Moreno by her nickname, and then Westmire drove away at fast speed; that Clayton jumped from the front seat to the back seat, hit her with the bottle, and while she was still screaming pushed her head down against the seat, and then she was on her back on the seat and he was on top of her; that he hit her on the head with the bottle about 15 times, choked her until she could not breathe, kept saying that he was going to kill her, and asked Westmire to give him the gun; that Westmire did not say anything in reply thereto, but kept driving fast; that Clayton took her gold watch, of the value of $35, off her wrist, and then he threw her purse into the front seat; that her purse was of the value of $5, contained about $6, and was about 12 inches long and 6 inches wide; that then, while she was on her back and he was on top of her, he pulled her dress up, said he was going to rape her, and told Westmire that she was menstruating; that Westmire told him "to make sure," and Clayton said she was flowing, and Westmire said "Throw her off"; that Westmire then stopped the automobile, and

as she was getting out Clayton pushed her; that she then said, "Give me my purse and watch"; that the automobile was then driven away at fast speed; that the time when she was let out of the automobile was about 3 a. m., and the place was in the hills, and was dark, and about one-half block from a house; that she was screaming and a woman came out of the house and took her therein. She testified further that she was menstruating at the time Clayton said he was going to rape her; that she did not regain her watch, or her purse or her money which was therein; that she and Mrs. Moreno had been to a public dance near 3rd and Main Streets, and had gone in a taxicab to Avenue 26 and Figueroa in order to catch the 12 o'clock bus which they had missed while they were downtown; and that she did not have any bruises or injuries on her head or throat when she entered the automobile, but she did have such bruises and injuries when she was let out of it.

Mrs. Moreno testified in substance the same as Mrs. Valenzula had concerning occurrences before Mrs. Moreno got out of the automobile. In additon thereto she testified that immediately after she got out of the automobile, and as she was turning around to get Mrs. Valenzula, she heard Clayton hit Mrs. Valenzula with a bottle, and heard her scream and call Mrs. Moreno by her nickname; that defendants then drove away at fast speed; that the next time she saw Mrs. Valenzula was about two hours later at the police station and at that time Mrs. Valenzula had "two black eyes" and a bruise on her neck under her chin; that Mrs. Valenzula did not have those marks on her when she entered the automobile; and that Mrs. Valenzula had a large purse with her that night, which purse was about 10 inches long and about 8 inches wide.

A physician testified that he examined Mrs. Valenzula at her home about 2 p. m. on May 20th; that she had a large lump, about the size of a small egg, on top of her head "from being struck with a blunt object"; and that there were bruises on both sides of her throat, and the inside of her throat was "so swollen that it was virtually impossible for her to swallow."

Police Officer McGarry testified that he arrested Clayton on May 23rd; that on May 24th he told Clayton that he wanted to talk to him about a robbery and that Clayton had been identified as one of two men who had robbed,

kidnaped and attempted to rape a girl by the name of Valenzula; that Clayton asked him what Westmire had said; that he (the officer) told Clayton that a recording had been made of a conversation between the officer and Westmire and that he would let Clayton hear it; that later that day the record was played in the presence of Clayton, the witness (McGarry), and Officers Brown and Laas; that it required about 45 minutes to play the record, and during the playing of it Clayton made statements on two occasions; that about the middle of the record there was a question by one of the officers directed to Westmire as to whether Westmire had seen Clayton hit the Valenzula girl on the head with a coca-cola bottle; that in answer to that question the record revealed that Westmire said, "I heard him hit her"; that another question on the record directed to Westmire concerned the number of times Clayton had hit her in that manner; that the record revealed that Westmire said, "Well, he did not know, but she kicked the back of the seat several times"; that when those questions and answers came through the loud speaker, Clayton said, "Dirty stool pigeon son-of-a-bitch, he didn't need to say that, did he, he is sure pouring it on me"; that after the record was played Clayton asked the officer (witness) whether the girls told him they were drinking with Clayton and Westmire, and when the officer replied that they had not told him, Clayton said, "I don't think much of women that drink with a man and then go out and holler rape"; that after they had left the room where the record had been played, Clayton said, "As long as that guy is stooling on me I will take you over and show you where he has got some stuff."

At the trial counsel for defendants objected to the offer of testimony as to what words or statements were on the record. The court stated that the testimony of Officer McGarry as to what the record contained could not be received. as to Westmire, and that McGarry's testimony as to what he heard from the record when it was played could be received as to Clayton, not to prove the truth of the statements, but only for the purpose of showing Clayton's response or reaction to accusatory statements. It was conceded by the district attorney that the record contained many immaterial and inadmissible statements and that the whole of the record or statements thereon should not be offered

in evidence. The record was played in the presence of the trial judge, but out of the presence of the jury. After having heard the record, the judge stated in the presence of the jury that there was immaterial and inadmissible matter in the record, but a portion of the record which was represented in typewriting on the first six pages of a type-written transcription of the record was admissible and might be played in the presence of the jury. That portion of the record was played in the presence of the jury, but the court instructed the jury at that time that it would not be binding upon Clayton. Reference will be made hereinafter to the statements included in that portion of the record.

Officer McGarry testified further that he had a conversation with Westmire on May 22nd in the presence of Officer Brown, and that Officer Laas was present during part of the conversation. The court stated that evidence as to conversations with Westmire, out of the presence of Clayton, would not be binding upon Clayton; and that evidence as to conversations with Clayton, out of the presence of Westmire, would not be binding upon Westmire. The testimony of McGarry as to that conversation was substantially the same as the testimony of Officer Brown, hereinafter referred to, concerning that conversation. McGarry testified further that he asked Westmire what happened to the purse, and Westmire replied that he did not know but he thought the purse had been thrown out of the car; and that Westmire said he had not seen the watch.

Officer Brown testified that he had a conversation for approximately three hours with Westmire on May 22nd in the presence of Officer McGarry, and that Officer Laas was present part of the time; that no force or violence was used on him at any time, no offer of reward or immunity was made to induce him to talk, and he talked voluntarily; that he (witness) was present when the record was made; that he (witness) made notes, principally in shorthand, when the conversation was had. He testified further that Westmire said: that he was driving his car on Figueroa, with Clayton in the front seat, and as they approached Avenue 26 they saw two girls on the corner, and he stopped the car and Clayton spoke to them; that the girls got into the car; that as they were approaching Fletcher Drive, Clayton nudged him with his foot, which indicated to get off the main street; that after he had turned to the right

at Fletcher Drive and had gone a few blocks the girls were demanding to be let out of the car, and he stopped the car; that just as one of the girls got out, Clayton slammed the door and said, "Step on it," and they drove away fast and went into the hills; that Clayton was in the back of the car with the girl, and that Westmire could "hear her being struck," could feel the rear part of the front seat being kicked, and knew that "she was raising a rumpus"; that during the scuffle Clayton told him she was menstruating, and Westmire said, "If she is menstruating leave her alone"; that shortly thereafter he stopped the car and the girl got out; and that he did not know anything about the purse. He testified further that he was present when Westmire was asked if he would make statements to Clayton such as he (Westmire) had made to the officers, and he replied that he would not because he had a "lot of time to do up to the joint and his life wouldn't be worth a nickel if they found out that he had stooled."

The portion of the record, of an interview with Westmire, which was played in the presence of the jury, was in substance the same as the testimony of the Officers McGarry and Brown concerning what Westmire said in his conversation with them. That portion of the record also included statements by Westmire, as follows: that Clayton said (when he was in the back seat with the girl, ". . . turn up this side street . . . we have got to let her out, or something, that she was giving him hell back there"; that she was fighting and screaming; that after she got out she "hollered about her purse," saying, "Oh, you have got my purse"; that Westmire told Clayton to throw her purse out, and Clayton said that he did throw it out; that Clayton did not mention the watch; that Clayton did not give him any part of the money that was in the purse; that it came as a surprise to him when the officers mentioned the watch and purse; that he was in the habit of carrying coca-cola bottles in his car. A portion of the record so played was verbatim as follows: "Q. Well, did he say anything about having hit her over the head with a Coca-Cola bottle? A. I heard that. Q. You heard him hit her over the head? A. Yes. Q. You could distinguish that kind of a sound? A. Well, I could feel her kicking up against my back seat. Q. How many times? A. Oh, she must have kicked the back seat there six or seven times. Q. Did she scream every time? A. Yes."

Westmire testified that he was questioned by the police officers about 10½ hours while he was in their custody; that he heard the portion of the record that was played before the jury, relative to a conversation between him and police officers, and that to the best of his recollection those were the questions asked and those were the answers given; that he had been convicted twice of the crime of burglary, a felony; that he was struck 10 or 12 times by Officer Laas, in the presence of Officer Brown, when he denied knowledge of certain things, and as a result thereof his eye was discolored; that Officer Laas told him that if he did not cooperate that he (Westmire) would get what was coming to him; that one time ''they '' said that if he did not confess those things they had asked about he ''would go out of here on a stretcher''; and that said conduct placed him in fear.

Clayton testified that he and Westmire got together on May 19,. 1944, after they had left work about noon of that day at the Coca-Cola Bottling Company; that they rode around in Clayton's car, which was a four-door sedan, until about midnight when they went to a garage at 7th and Central and took Westmire's car, which was a two-door club coupe, and left Clayton's car there; that they transferred liquor and coca cola from Clayton's car to Westmire's car; that they had been drinking whiskey on that day after they left work; that he and Westmire were in Westmire's car at Avenue 26 and Figueroa about 12:30 a. m. on May 20, 1944, and Westmire was driving; that they stopped at that place and Clayton invited two girls who were there to ride; that after Clayton said they would take the girls home, the girls entered the rear seat of the car; that in order for a person, riding in the rear seat, to get in or to get out of that car, it was necessary to push the front seat forward; that he offered a drink of whiskey to the girls but they refused it; that when they turned to the right at Fletcher Drive, the Moreno girl said she wanted to get out of the car, and the other girl said it was all right to take a ride; that after they had gone about 14 blocks they let one of the girls out; that he got in the back seat with the other girl, offered her some whiskey, and she took two drinks of it; that he then put his arm around her and said ''let's have a little loving''; that she pushed him away, and he grabbed her, pulled up her dress and laid his hand on her

leg; that she asked him what he was going to do, and he said, "... you got in the car with a couple of strange men at 12:30 at night; you knew ... good and well what you got in here for"; that she slapped him, and then hit him on the shoulder with a coca-cola bottle; that he took the bottle from her and hit her with it, and then he said, "I am going to have a little piece"; that she said that he could not, because she was sick; that he said that if she had told him that "before all this started" it would not have happened, and that he thought that was "why she got in the car"; that he told Westmire to stop the car, and the car having stopped he got out and helped her out of the car; that he told her if she would quit screaming they would take her home, but she would not quit, and he started to get into the car, and she asked him for her purse; that he and Westmire looked in the car for the purse, but could not find it; and that she started down the street, and he got into the car and told Westmire to drive away. He testified further, on cross-examination, that in the afternoon preceding the time they met the two girls, he and Westmire tried to pick up a girl, a stranger to them, near Union and Olympic Avenues; that they did not pick her up, but they took her purse and divided the money therein between themselves. He also testified that he had been convicted twice of the crime of robbery, a felony, and that he had been convicted of violation of the Dyer Act, a felony.

It was stipulated that Officer Laas would testify that he did not at any time strike Westmire.

█ The evidence was sufficient to support the convictions of both defendants of attempted rape. Clayton by use of force and violence, of which Westmire was fully aware, prevented Mrs. Valenzula from getting out of the automobile when Mrs. Moreno got out. Immediately thereafter, at the direction of Clayton, Westmire drove away at fast speed, turned into a side street, and went into the hills. While Westmire was so driving, Clayton was beating, choking, and threatening to shoot and kill Mrs. Valenzula, and she was kicking the back of the front seat, was fighting ·Clayton, and was screaming. That extreme violence was used by Clayton, while Westmire was driving, is strongly corroborated by the testimony of the physician who examined Mrs. Valenzula. Westmire was aware of such conduct by Clayton, and aided and abetted him by continu-

ing to drive at the direction of Clayton. She was on her back and Clayton was on top of her. Clayton said he was going to rape her, and he pulled her dress up. It was only after. Clayton had said that she was menstruating, and after Westmire had required Clayton "to make sure" that such was her condition, and after he had been so assured, that Westmire did anything other than to encourage and aid Clayton in his obvious attempt to commit rape. It is not suggested that Westmire was compelled to so drive. He had every opportunity to avoid participation in such conduct of Clayton.

The evidence was sufficient to support the convictions of both defendants of robbery. In the view of the evidence most favorable to the respondent, Clayton took Mrs. Valenzula's watch from her wrist, and also took her purse and money from her, and kept the same; and he took and kept those things with the intention of permanently depriving her of them. As to Westmire it is argued that he did not actively participate in taking those articles, did not knowingly aid or abet in the robbery, if any, did not intend to aid therein, and did not know that Clayton had intent to commit robbery. In the view of the evidence most favorable to respondent, it was shown that Mrs. Valenzula's large purse (about 6" x 12") was thrown by Clayton into the front seat (where Westmire was riding); that Westmire told Clayton to throw her purse out; and that Clayton and Westmire, under similar circumstances, had committed robbery a few hours previously by taking a purse from a girl and dividing the money therein between themselves. The jury was entitled to conclude, especially in view of the large size of the purse and the fact that it was thrown, that Westmire knew it was in the front seat, and that Westmire's search for it in the back and in the front of the car was not in good faith and was a false attempt to find it. Although Westmire denied knowledge as to the purse, the jury was entitled to conclude that he knew something concerning it since he told Clayton to throw it out. In determining the intent of defendants, relative to the purse and watch, the jury was entitled to consider the acts and designs of the defendants, under somewhat similar circumstances, in taking a purse and money from a girl a few hours previously. In deciding the credibility of the witnesses, the jury was entitled to consider, as evidence impeaching the defendants,

the fact that each defendant had been convicted of two felonies. The evidence was sufficient to support a finding that the purse and watch were taken in furtherance of a preconceived design on the part of both defendants, especially in view of the midnight shift from the four-door car to the two-door car preliminary to "riding around" soon after a similar act of taking a purse was committed by the defendants while "riding around." The circumstances under which Westmire drove the car were such that a finding that he knowingly aided and abetted Clayton in committing the robbery would be justified.

██ Appellants assert that the instructions pertaining to robbery were erroneous, contradictory and confusing with respect to the element of intent. The court gave the following instruction: "The word 'willfully' when applied to the intent with which an act is done or omitted implies simply a purpose or willingness to commit the act or make the omission referred to. It does not require any intent to violate law or to injure another or to acquire any advantage." The court also gave the following instruction: "A person must be presumed to intend to do that which he voluntarily and willfully does in fact do, and must also be presumed to intend all the natural, probable and usual consequences of his own acts." The court gave the following instruction: "The Court further instructs the jury that the intent or intention with which an act is done is manifest by the circumstances connected with the offense and the sound mind and discretion of the accused. All persons are of sound mind who are neither idiots nor lunatics nor affected with insanity." The court also gave the following instruction: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute any particular species or degree of crime, the jury, in determining the purpose, motive or intent with which the accused committed the act, may take into consideration the fact that he was intoxicated at the time. But in cases of *Attempted Rape, Robbery and Kidnaping* the specific intent to *commit the crime or crimes* is a necessary element of the crime and involves, of course, an inquiry into the state of mind under which the party committed the act charged; and in the prosecution of such inquiry his con-

dition at the time of the alleged offense, as drunk or sober, may properly be considered. The weight to be given to evidence of drunkenness is a matter for the jury to determine in connection with all the other evidence and circumstances in proof of the case.'' No request was made for any other instruction upon the subject of intent. The instructions were sufficient.

Appellants contend that evidence as to the conversation with Westmire, which was recorded, should not have been received. They argue that no foundation was laid as to its free and voluntary character. Two officers testified, as above shown, that no force or violence was used on him, that no offer of reward or immunity was made to him, and that he talked voluntarily. Westmire testified that Officer Laas struck him. Officer Laas denied that he struck him. A sufficient foundation was laid for admitting the conversation in evidence. Furthermore, Westmire testified that the questions asked and the answers given, in the portion of the record that was played before the jury, were to the best of his recollection the questions asked and the answers given.

By reason of the above conclusions it is not necessary to discuss other contentions made by appellants, concerning instructions as to third degree methods and due process of law.

The judgments as to both defendants are affirmed.

Desmond, P. J., and Shinn, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied November 29, 1945.