[Crim. No. 14034. In Bank. Oct. 4, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD WELCH, Defendant and Appellant.

**COUNSEL**

Molly H. Minudri, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, Daniel J. Kremer and Willard F. Jones, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BURKE, J.**—A jury found Richard Welch guilty of first degree murder of Randall Jenkins and of assault with a deadly weapon with intent to commit murder upon Diane Bradford and fixed the penalty at death for the murder. No sentence was imposed for the assault. A motion for a new trial was denied, and defendant's automatic appeal is now before us. (Pen. Code, § 1239, subd. (b).)

Defendant contends that the court erred in denying his motion for a change of venue, in admitting a tape recording of certain conversations, in giving instructions regarding rape and the felony-murder rule, and in failing to give an instruction on mistake of fact.[1] We have concluded that none of the contentions can be upheld but that, since the death penalty cannot constitutionally be imposed, the judgment should be modified in accordance with *People* v. *Anderson,* 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880] (see also *Furman* v. *Georgia,* 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726]). We affirm the judgment as so modified.

---

[1] Defendant also makes several contentions relating to the death penalty, but it is unnecessary to consider them since we held the death penalty unconstitutional in *People* v. *Anderson,* 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880].

On the afternoon of September 25, 1968, Randall Jenkins, age 17, and Diane Bradford, age 18, began hitchhiking from San Jose to go to Salt Lake City, Utah. Following several rides they reached Bakersfield. Around 10 that night defendant, who was 27, and his 17-year-old wife Anita, offered them a lift, and they accepted. Since the back seat of the car was full of belongings, all four rode in the front seat. After Anita drove a short way, defendant took over the driving and Anita sat·next to him, then Diane, and then Randall.

Diane fell asleep but awoke upon hearing gunshots. The car was stopped when she awoke. Randall fell on her lap, and defendant and Anita told her "It's all right." Defendant got out of the car, pulled Randall out and dropped him on the ground. Defendant then reentered the car and sat by Diane. His wife was still in the car. He asked Diane if she had any money, and she replied that she did not. He then put his hand up her blouse and said something to the effect that he was going to rape her. Diane said that she had gonorrhea, and he replied that he did not believe her. He told her to get out of the car and she complied. He agreed that she could use a blanket that was in the car. Upon his order she removed her capri pants and underpants. He thereupon stated, "Well, I don't think I will because you might have something." He subsequently shot her in the head and drove off with Anita.

Around 2 a.m. on September 26, 1968, Diane regained consciousness. She managed to get her underpants on but as a result of her weakened condition was unable to put on her capris. After observing that Randall appeared lifeless, she stumbled toward the highway to get help. A motorist stopped and took her to the sheriff's substation in Mojave, and from there she was taken to a hospital where she underwent surgery. Bullet and bone fragments were imbedded in her brain.

An ambulance driver located Randall's body a few miles east of Mojave. According to the autopsy surgeon, the cause of death was a bullet wound in the head.

At the scene of the shootings officers found, among other things, Diane's capri pants and a bullet. Expert testimony indicated that the bullet from Randall's head, a bullet fragment from Diane's head, and the bullet at the scene were fired from a specified gun, and the gun was shown to have been purchased by defendant in August 1968 and to have been found along the highway around November 1968.

After the shooting defendant and his wife returned to Bakersfield and from there went to Texas after obtaining money from Anita's mother. Anita spent a few days with her parents and then went with defendant to a motel.

There he beat her up and threatened to kill her if she "said anything." On October 5, 1968, she was arrested, and two days later defendant was arrested.

Defendant made a statement to the F.B.I. agent who arrested him to the following effect: In the latter part of September 1968 in Bakersfield defendant and his wife picked up two hitchhikers, a boy and a girl who said they were going to Salt Lake City, Utah. Defendant subsequently overheard the girl say to the boy "Do you still plan to?" or "Are you still going to do what you said you were going to do?" He became concerned that they were going to rob or harm his wife and himself. He therefore obtained a gun from his car trunk and placed it near him. After going through Mojave he stopped to let his car cool. He noticed that the boy hitchhiker, who seemed to be sleeping, appeared to reach into his boot for what defendant thought might be a gun or knife, although he never saw a gun or knife. Fearing that he and his wife were about to be harmed, defendant reached for his gun. The boy raised his head, and defendant told him "not to do what he was going to do, to stop," but the boy continued to raise up. At that point defendant shot the boy in the head. After removing the boy from the car, he told the girl hitchhiker to get out. He had her lie on a blanket. He then shot her in the head because she was a witness to the shooting of her companion. When he left he assumed they were both dead. He threw the gun away en route back to Bakersfield.

Defendant, testifying in his own behalf, gave a version similar (although not identical in all details) to that he had given the F.B.I. agent. Defendant stated, inter alia, that he shot Randall because he thought Randall was reaching for a weapon and that he subsequently panicked and shot Diane. He denied asking Diane for money and stating that he was going to rape her and testified that she did not remove any of her clothes while he was there.

Richard Burdick, a psychiatrist called to the stand by the defense, testified: He examined defendant on three occasions in 1969. Defendant does not have a mental illness but has an "emotionally unstable personality," and "This is characterized by impulsivity, usually very poor judgment under situations of stress." Defendant also has "significant elements of paranoid personality, although not to the extent that he would be characterized as a paranoid personality."

In the doctor's opinion at the time of the alleged murder defendant was incapable of deliberating and premeditating or harboring malice aforethought, although he might have the ability to do so on some other occasions. The opinion was based in part upon the assumption that certain

matters stated by defendant were true, such as that defendant became concerned that Randall and Diane might harm him and his wife and thought Randall was going to obtain a weapon from his boot. The doctor believed the offense had "no reasonable motive, except in terms of being an impulsive act. . . ." In his opinion neither a robbery nor rape motive seemed very plausible.

The defense also elicited testimony that Diane and Randall took L.S.D. and marijuana on the night of September 24, 1968, and the defense called as a witness a truck driver who testified that he gave Diane and Randall a lift on September 25, 1968, and that they both appeared "hopped up" and told him they were "on acid."

Dr. Thomas Ungerleider, a psychiatrist called as a defense witness, testified that a person under the influence of L.S.D. often will not respond to an order such as "Stop what you are doing." He further stated that an L.S.D. trip usually lasts 12 to 18 hours but may last several days and that marijuana could prolong the effect of L.S.D.

In rebuttal the prosecution called to the stand a patrolman who stated that he talked with Diane and Randall in Bakersfield on the night of September 25, 1968, and that they did not appear to be under the influence of anything. A service station attendant in Bakersfield who talked with Diane on the same night stated he noticed nothing strange in her behavior. An investigator testified that during an interview on September 26, 1968, the truck driver who testified for the defense discussed giving Diane and Randall a lift and did not mention that he thought they were under the influence of any drug.

The evidence is sufficient to support the conviction of the murder and aggravated assault, and defendant makes no argument to the contrary. He seeks, however, to have the judgment reversed on the following grounds:

*Asserted Error in Denying Motion for a Change of Venue*

On June 23, 1969, before the proceedings for the selection of the jury, defendant moved for a change of venue on the ground that as a result of publicity he could not get a fair trial in Kern County. (See Pen. Code, § 1033.) In support of the motion he presented testimony that there were at least 15 broadcasts on KAFY that *Mrs.* Welch pled guilty to being an accessory to (1) murder and (2) assault with a deadly weapon with intent to commit murder. The broadcasts were on six days, and it may be inferred that the broadcasts were on various dates from December 26,

1968, to May 16, 1969.[2] Evidence was also presented that there was newspaper publicity concerning Mrs. Welch's plea; the date or dates of such publicity were not established. In addition, defense counsel represented that "[r]ecently" the Bakersfield Californian contained an article which he believed stated that there were 17 or 18 defendants in the Kern County jail awaiting trial for murder, and defense counsel further stated that judicial notice should be taken "that there has been a good deal of publicity in this matter," the exact nature of which was not shown except as set forth above. The court, in ruling on the motion stated, "I doubt if very many of [the veniremen] will have read the articles or heard the radio reports. You may inquire into that on voir dire, and if it develops that they have and they are prejudiced in any way, they will be eliminated. . . . I will deny the motion." Defendant did not seek immediate relief by writ of mandate, nor did he renew his motion during or after the *voir dire* of the veniremen.

A change of venue must be granted when the defendant shows " 'a reasonable likelihood that in the absence of such relief, a fair trial cannot be had.' " (*Frazier* v. *Superior Court,* 5 Cal.3d 287, 294 [95 Cal.Rptr. 798, 486 P.2d 694]; *Maine* v. *Superior Court,* 68 Cal.2d 375, 383 [66 Cal.Rptr. 724, 438 P.2d 372].)[3] And it is the duty of the reviewing court to make an independent evaluation of the circumstances and to satisfy itself de novo that the defendant obtains a fair and impartial trial. (*Frazier* v. *Superior Court, supra,* at p. 293; *People* v. *Tidwell,* 3 Cal.3d 62, 69 [89 Cal.Rptr. 44, 473 P.2d 748]; *Maine* v. *Superior Court, supra,* 68 Cal.2d 375, 382.)

In the case before us defendant failed to establish a reasonable likelihood that he could not have a fair trial in Kern County. The victims, as well as defendant, were strangers to that community. Kern County has a population of 343,300 ranking 13th of California's 58 counties. (See *Whittaker* v. *Superior Court,* 68 Cal.2d 357, 373 [66 Cal.Rptr. 710, 438 P.2d 358].) So far as appears the publicity complained of was a month or more before the trial,[4] and no showing was made that such publicity was

---

[2]The only evidence as to the time of the broadcasts was that they were "every time there has been an appearance [by defendant] in the Superior Court . . . with one exception, the last motion by [the prosecutor] . . . ." From the clerk's transcript it appears that the last motion by the prosecutor was on May 23, 1969, and that defendant had theretofore appeared in the superior court on various dates from December 26, 1968, to May 16, 1969.

[3]The standard in *Maine* v. *Superior Court, supra,* is applicable here, since the instant case proceeded to trial after the opinion in *Maine* became final. (*Maine* v. *Superior Court, supra,* 68 Cal.2d 375, 384, fn. 9.)

[4]The representation by defense counsel that "[r]ecently" a specified article appeared in the Bakersfield Californian is not contrary to the above since the quoted term does not preclude the articles having appeared a month or more before the

other than ordinary news coverage with the possible exception of the guilty plea by Mrs. Welch to being an accessory to specified crimes including murder. It does not appear from the *voir dire* examination of the jurors selected to serve that any of them had heard of that plea, although some who indicated they had heard or read of the case were not examined as to whether the matters they had heard or read included reference to Mrs. Welch. Each of the jurors selected indicated either that he was not familiar with the facts of the case[5] or that he had formed no opinion as to defendant's guilt or innocence or could act fairly and impartially. The defense accepted both the jurors and alternates without exhausting its peremptory challenges as to either group. Under the circumstances the court did not err in denying the motion for a change of venue (see e.g., *People* v. *Miller,* 71 Cal.2d 459, 471-474 [78 Cal.Rptr. 449, 455 P.2d 377]) and in not thereafter raising the matter on its own motion.

### Asserted Error in Receipt of Tape Recording

■ Defendant contends that the court erred in admitting at the guilt trial a tape recording of interviews Officers Frank and Dennis had with Diane on the evening of September 26, 1968, and on September 27, 1968, because (1) the tape recording was inadmissible under Evidence Code section 791[6] and (2) the prejudicial effect of the tape recording outweighed any probative value it might have.

A timely objection was not made at the trial to the receipt of the tape recording on the first of the foregoing grounds.[7] It is the general rule

---

trial. In any event, even if the article was published at the outset of the trial and represented that there were 17 or 18 defendants in the Kern County jail awaiting trial for murder, the article manifestly would not prevent defendant's receiving a fair trial in that county.

[5] Two so indicated by failing to raise their hands when the court inquired of the jurors in the jury box (which included the two in question) whether there is anyone in the jury box "who is familiar with the events surrounding the alleged offense," and others expressly stated that they did not know the facts surrounding the alleged "offense."

[6] Evidence Code section 791 provides: "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after:
"(a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made *before* the alleged inconsistent statement; or
"(b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." (Italics added.)

[7] Even if defendant's remarks at the motion for a new trial raised the objection, this, of course, did not constitute a timely objection at the trial.

that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection at the trial on the ground sought to be urged on appeal (Evid. Code, § 353; *People* v. *De Santiago,* 71 Cal.2d 18, 22 [76 Cal.Rptr. 809, 453 P.2d 353]; *People* v. *Mabry,* 71 Cal.2d 430, 431 [78 Cal.Rptr. 655, 455 P.2d 759]; *People* v. *Robinson,* 62 Cal.2d 889, 894 [44 Cal.Rptr. 762, 402 P.2d 834]), and it does not appear that any exception to that rule is applicable here.

■ With respect to the second of the above grounds, it appears that when the tape recording was first offered defendant objected to its admission on that ground. The court, after listening to the tape recording, sustained the objection but stated that if there was thereafter "serious impeachment" the prosecution might renew its offer. Later the prosecution renewed its offer, and the court stated that "there has been a considerable amount of effort to impeach Diane . . . so I will rule the tape is admissible." Even if defendant's subsequent comments are viewed as preserving his prior objection to the tape recording, the court, as we shall see, did not err in admitting it.

At the trial Diane testified to facts from which it appears that defendant, after shooting Randall, attempted to rob and rape her.[8] Evidence established the time of the alleged offenses to be shortly before 2 a.m. on September 26, 1968.

Defense counsel elicited testimony that (1) during a conversation Officers Estes and Morales had with Diane around 2:30 a.m. on September 26, 1968, at the sheriff's substation, she did not mention an attempted rape or say that "anybody asked for money"; (2) during a conversation Officer Fisher had with Diane around 4 a.m. on September 26, 1968, at the hospital, she had no recollection of a rape or attempted rape and did not mention that anyone tried to rob her; (3) during a conversation Officer Crafton had with Diane commencing at 4:47 a.m. on September 26, 1968, at the hospital, she did not say anything about being robbed or asked for money. Crafton further testified, in response to questions by the prosecution, that during the 4:47 a.m. conversation Diane stated that "the man" told her he was going to rape her.

At the above three conversations during the early morning hours on September 26, 1968, Diane was coherent but was not in good physical condition.[9] The conversations were shortly after she was shot and before bullet

---

[8] A contention by defendant that the facts do not show attempted rape is discussed hereinafter and, as we shall see, lacks merit.

[9] At the time of the first conversation she was bloody, complained of pain, and appeared a couple of times to be on the verge of losing consciousness. At the second

fragments were removed from her brain during surgery on the morning of September 26, 1968.

On cross-examination by defense counsel, Officer Frank testified that during an interview that he and Officer Dennis had with Diane on the evening of September 26, 1968 (one of the interviews on the tape recording in question), she told them of the attempted rape and attempted robbery. In response to questioning by defense counsel Frank further testified that in a report he made regarding the interviews he did not mention that she indicated the attempted robbery. According to Frank, this was probably an oversight. Diane likewise testified that she mentioned "a rape" to Frank and Dennis. When asked by defense counsel, "You never mentioned a robbery to them at that time, did you?," she replied, "I told them the whole story." Dennis' testimony reflected uncertainty whether Diane reported the robbery at that time.

The prosecution thereafter introduced into evidence the tape recording in question. It contained statements by Diane indicating in accord with her testimony at the trial that defendant attempted to rape and rob her.

The jury was instructed that evidence of a prior statement by a witness consistent with his testimony was not received for the purpose of proving the truth of what was said but only for the purpose of supporting the witness' credibility and that the jury was permitted to consider such evidence only for that purpose.

The tape recording manifestly does have some prejudicial effect since Diane stated therein, "I'm in so much pain I can hardly talk to you" and asked for a doctor, and her voice at times became weak and inaudible. The jury, however, was already fully aware that she had suffered since the evidence showed she was shot in the head and the surgeon described her injuries.

"The chief elements of probative value are relevance, materiality and necessity." (See *People* v. *Schader,* 71 Cal.2d 761, 774 [80 Cal.Rptr. 1, 457 P.2d 841].) The tape recording is relevant and material since it tends to rebut the defense's implied charge of recent fabrication. By eliciting testimony that Diane during the three interviews in the early morning hours of September 26, did not mention the attempted robbery and attempted rape or the attempted robbery alone or did not recall a rape or attempted rape the defense apparently was seeking to show that her testimony regarding the attempted crimes was a recent fabrication. The tape-

conversation her voice would become weak, she would act as if she might not realize the officer was there, and he would repeat questions before receiving an answer. At the third conversation she became progressively less alert.

recorded conversations beginning on the evening of September 26, in which she reported the attempted robbery and attempted rape, together with the evidence of her physical condition at the time of the prior three interviews, tend to rebut the defense's implied charge. (See 4 Wigmore on Evidence (3d ed.) pp. 205-207.) Although the tape recording is cumulative in the sense that Officer Frank had theretofore testified that Diane mentioned the attempted robbery and attempted rape during the interview on the evening of September 26 (which interview was on the tape recording), and Diane had given similar testimony, the tape recording is not cumulative to that testimony with respect to evidentiary weight. The tape recording leaves little or no doubt that Diane reported the attempted robbery and attempted rape to Officers Frank and Dennis. On the other hand, the defense sought to raise doubt as to Officer Frank's and Diane's recollection of what Diane stated by eliciting testimony from Frank that he had not included her asserted statement regarding the attempted robbery in a report he had made regarding the conversations. Nor is the tape recording cumulative to Officer Crafton's testimony that at the September 26, 4:47 a.m., interview she mentioned the attempted rape. The tape recording shows that at the interviews with Officers Frank and Dennis she reported not only the attempted rape but also the attempted robbery. Also the possibility of a faulty recollection as to what was said is not present with respect to the tape. We conclude that the court did not abuse its discretion in admitting the tape recording.

Defendant's reliance on *People v. Love,* 53 Cal.2d 843, 856-857 [3 Cal. Rptr. 665, 350 P.2d 705], is misplaced. There a photograph of the victim showing her expression in death and a tape recording of a conversation with her shortly before her death were admitted into evidence at the penalty trial. We stated that "Apart from matters admitted by defendant and established at the trial of guilt, the photograph and the tape recording tended to prove only that [the victim] died in unusual pain. Proof of such pain is of questionable importance to the selection of penalty unless it was intentionally inflicted [Fn. omitted.] Moreover, even if relevant and material, [her] pain was more than adequately described by the doctor. . . . Both the photograph and the tape recording served primarily to inflame the passions of the jurors and both should have been excluded." Here the tape recording was not merely illustrative of pain apart from matters admitted by defendant and instead tended to rebut the defense's implied charge of recent fabrication.

*Asserted Errors in Instructions*

■ The jury was instructed: "All murder which is perpetrated by means of poison or lying in wait, torture, or by any other kind of willful, deliber-

ate and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288 of the Penal Code, is murder of the first degree, and all other kinds of murder are of the second degree." The instructions given also defined "rape." No instructions were requested or given defining "robbery" or "attempt."

Defendant contends that it was improper to give the foregoing instructions since there was no evidence of rape or attempted rape and "the facts . . . do not warrant the instructions" regarding murder committed in the perpetration of or attempt to perpetrate rape. The contention lacks merit.

To " 'constitute an attempt, there must be (a) the specific intent to commit a particular crime, and (b) a direct ineffectual act done towards its commission. . . . To amount to an attempt the act or acts must go further than mere *preparation;* they must be such as would ordinarily result in the crime except for the interruption.' " (*In re Smith,* 3 Cal.3d 192, 200 [90 Cal.Rptr. 1, 474 P.2d 969], quoting from 1 Witkin, Cal. Crimes (1963) § 93, p. 90.) Here the evidence that defendant put his hand up Diane's blouse and said something to the effect that he was going to rape her manifestly warranted a finding by the jury that he intended to rape her, and the heretofore recited evidence, including, among other things, evidence that defendant, after shooting Randall, ordered Diane to remove her pants, showed more than mere preparation and constituted proof of one or more overt acts towards the commission of rape. Trauma to the area of the private parts is not essential to establish attempted rape. (*People* v. *Hillery,* 62 Cal.2d 692, 705 [44 Cal.Rptr. 30, 401 P.2d 382].) Proof that defendant abandoned his criminal intent after being advised by Diane that she had gonorrhea did not preclude a finding that he was guilty of attempted rape. (Cf. *People* v. *Westmire,* 71 Cal.App.2d 432, 441 [162 P.2d 988] [defendant guilty of attempted rape where he beat and threatened prosecutrix, said he was going to rape her, and pulled up her dress but upon ascertaining that she was menstruating did not proceed further].)

Penal Code section 189 provides: "All murder . . . which is committed in the perpetration of, or attempt to perpetrate . . . rape . . . is murder of the first degree." This section "has been construed as not requiring a strict causal relation between the felony and the homicide, and the homicide is committed in the perpetration of the felony if the killing and the felony are parts of one continuous transaction. (*People* v. *Mason,* 54 Cal.2d 164, 168-169 [4 Cal.Rptr. 841, 351 P.2d 1025]; *People* v. *Chavez,* 37 Cal.2d 656, 669-670 [234 P.2d 632].)" (*People* v. *Whitehorn,* 60 Cal.2d 256, 264 [32 Cal.Rptr. 199, 383 P.2d 783].) The person killed need not be the

object of the felony. (*People* v. *Cabaltero,* 31 Cal.App.2d 52, 57-60 [87 P.2d 364]; see Witkin, Cal. Crimes, *supra,* § 313, p. 285-286.) The previously recited evidence warranted a finding by the jury that defendant murdered Randall in an attempt to perpetrate rape of Diane. Accordingly, it was not error to instruct the jury regarding murder committed in an attempt to perpetrate rape.

Nor was it error to give the above quoted instruction, which defined first and second degree murder in the language of Penal Code section 189 as it then read, even though some of the language was inapplicable to the facts of the instant case. (*People* v. *Chavez,* 37 Cal.2d 656, 667-668 [234 P.2d 632]; *People* v. *Chaves,* 122 Cal. 134, 141 [54 P. 596]; *People* v. *Bauer,* 241 Cal.App.2d 632, 641 [50 Cal.Rptr. 687].)

Defendant does not contend that the court erred in failing *sua sponte* to define the terms "robbery" and "attempt," and we need not consider that question since, even if it be assumed that the court erred in this regard, the error was not prejudicial. (Cal. Const., art. VI, § 13; *People* v. *Watson,* 46 Cal.2d 818, 836-837 [299 P.2d 243].) The evidence including defendant's own testimony established that he shot and killed Randall. Whether defendant did so in an attempt to perpetrate robbery and rape depended primarily upon whether the jury accepted Diane's or defendant's version as to what transpired, and it is not reasonably probable that a result more favorable to defendant would have have been reached had the court defined "robbery" and "attempt" in the instructions.

■ Defendant contends that the court erred in refusing to give an instruction requested by him on mistake of fact. The instruction (CALJIC (3d ed.) No. 4.35) reads: "An act committed or an omission made under an ignorance or mistake of fact which disproves any criminal intent is not a crime. Thus a person is not guilty of a crime if he commits an act or omits to act under an honest and reasonable belief in the existence of certain facts and circumstances which, if true, would make such act or omission lawful." Defendant points to statements by him indicating that in shooting Randall defendant acted in defense of himself and his wife because he thought Randall was reaching for a weapon in his boot. Other evidence indicated that Randall did not have a weapon in his boot. The jury was given extensive instructions on the law of self-defense and defense of another including the doctrine of apparent necessity.[10] Under the circumstances

---

[10]The instructions given stated in part: "You will note that actual danger is not necessary to justify self-defense. If one is confronted by the appearance of peril which arouses in his mind, as a reasonable person, an honest conviction and fear that he is about to suffer death or great bodily harm, and if a reasonable man in a like situation, seeing and knowing the same facts, would be justified in believing

it is clear that the instructions given sufficiently covered the theory of the defense and that the court did not err in failing to give the above quoted instruction.

The judgment is modified to provide a punishment of life imprisonment instead of death for the murder and as so modified is affirmed.

Wright, C. J., Peters, J., Tobriner, J., and Mosk, J., concurred.

**McCOMB, J.**—I concur in the majority opinion, except that, for the reasons expressed in my dissenting opinion in *People* v. *Anderson,* 6 Cal.3d 628, 657 [100 Cal.Rptr. 152, 493 P.2d 88], I dissent from the modification of the judgment.

---

himself in like danger, and if the person so confronted acts in self-defense upon such appearances and from such fear and honest convictions, his right of self-defense is the same whether such danger is real or merely apparent." The instructions given made it clear that the doctrine of apparent necessity also applied to defense of the person's wife.