[Crim. No. 32726. Second Dist., Div. Two. Oct. 26, 1978.]

In re BOOKER CLARENCE T. GRISSOM on Habeas Corpus.

COUNSEL

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Shunji Asari and Janelle B. Davis, Deputy Attorneys General, for Appellant.

Quin Denvir, State Public Defender, Charles M. Sevilla, Chief Assistant State Public Defender, and Jonathan B. Steiner, Deputy State Public Defender, for Respondent.

OPINION

**FLEMING, J.**—After defendant's conviction for second degree murder the trial court granted defendant's petition for habeas corpus relief and ordered a new trial on the basis of incompetency of defendant's trial counsel, Arnold Johnson. The People appeal the trial court order (Pen. Code, § 1506). We vacate the order and reinstate the conviction.

FACTS

In the early morning hours of August 11, 1975, defendant and Richard Singleton, Negroes, followed three Mexican-American women home to their apartment building, and there got the worst of a fight with three Mexican-American men. An hour later defendant and Singleton returned to the scene of the fight, Singleton now armed with a shotgun. After knocking and kicking doors of several apartments in the building and questioning the occupants, defendant and Singleton confronted two Mexican-Americans seated in a truck, who had not been involved in the prior incident. Without provocation, Singleton shot and killed one of them. At a joint trial of 24 days in November and December 1975 Officer Renk testified that Singleton told him that immediately before the shooting defendant had said, "Don't do it." The jury convicted Singleton of second degree murder but was unable to reach a verdict on defendant. In April 1976 defendant's counsel in the first trial withdrew, and was succeeded by Arnold Johnson. In a retrial of 18 days during May and June 1976 defendant was convicted of second degree murder.

On appeal defendant's conviction was affirmed and his petition for writ of habeas corpus was denied.[1] The Supreme Court denied a hearing, ordered the petition for habeas corpus refiled, and ordered the Director of Corrections to show cause before the trial court why the relief prayed for in the petition should not be granted. Defendant's petition asserted he had been deprived of his right to effective counsel by reason of the second trial counsel's incompetency in failing to investigate the possibility of a diminished capacity defense based on defendant's asserted history of epileptic seizure.

On January 13, 1978, the People filed a return to the petition, which alleged defendant was in lawful custody by virtue of a judgment, had had effective assistance of counsel at trial, and had not suffered a violation of his constitutional rights. Defendant traversed the return, incorporating by reference his petition and the Penal Code section 1203.03 diagnostic report.

The factual basis for habeas corpus relief from incompetency of counsel was: (1) a one-page record of August 11, 1975, from Morningside Hospital, where defendant was examined at 10:48 a.m. after his arrest, which stated in the lower left hand corner ". . . had possible seizure—prob. just severe anxiety"; (2) a report of August 11, 1975, from U.S.C.-Los Angeles County Medical Center approximately two hours later which stated ". . . had possible seizure . . . observe for seizures"; (3) signed declarations by defendant's sisters which indicated they had provided defendant's past medical records (which contained reports that in 1970 defendant had suffered four grand mal epileptic seizures)[2] to counsel prior to close of the prosecution case-in-chief; (4) the posttrial Penal Code section 1203.03 psychiatric evaluation which included a August 16, 1976 speculation that defendant was ". . . a man with a chronic alcoholic problem, who seems to have been involved in the homicide largely as a spectator, at a time when he was deeply intoxicated on alcohol, and barely knew what was happening."[3] It is claimed the foregoing supports a finding of incompetency of counsel, when viewed in conjunction with. defendant's unsworn claim that he told counsel before the trial that he had a history of epileptic seizures and had lost consciousness prior to the murder as a consequence of excessive drinking. Defendant did not disclose to trial counsel his postconviction claim that Singleton drove defendant's auto on the day of the murder because

---

[1] *People* v. *Grissom*, 2d Crim. No. 29868 and No. 30835 (see appen. A).

[2] See appendix A.

[3] Appendix B.

defendant had lost his license as a result of an accident during an epileptic seizure.

On February 7, 1978, based on the documentation on file and the reporter's and clerk's transcripts of the murder trial, the trial court granted the petition for writ of habeas corpus and vacated the judgment. However, on February 14 the court stayed execution pending hearing of the People's motions for reconsideration and for an evidentiary hearing. The court treated the People's motion as one for relief from judgment under Code of Civil Procedure section 473, and in support of the motion on March 2 allowed the examination of Arnold Johnson, defendant's counsel at the second trial. Johnson testified he was unaware prior to trial that defendant had a history of possible epilepsy. Johnson had been told by the defendant prior to trial that defendant had been drinking the evening before the crime and had temporarily blacked out after the beating and before the murder. Before the trial Johnson reviewed defendant's medical records at Morningside Hospital and County-U.S.C. Hospital and talked to the treating physician at county hospital. In Johnson's judgment the pressure of testifying would have been too great for defendant. Based on Singleton's report of defendant's "Don't do it" statement, plus credibility considerations for other identification witnesses, Johnson concluded, after consultation with counsel from the first trial, that the best defense strategy would be to prove defendant did not aid and abet the murder. Johnson did not wish to emphasize any diminished capacity aspect of the case, because he did not want to concede to the jury that the defendant had in fact participated in the crime. Johnson further testified he did not receive any information about, or investigate, defendant's history of possible prior epilepsy until after trial. Johnson admitted a pretrial preview of the Morningside Hospital records, but did not specifically recall an August 4, 1972, hospital report which stated defendant ". . . states he has seizures . . . claims epilepsy . . . depressed [has a] possible convulsive disorder." Johnson knew the law of diminished capacity, although he had never used it as a defense.

## DISCUSSION

■ 1. *Procedural Setting.* In a habeas corpus proceeding the return to the order to show cause must allege facts to establish the legality of the challenged detention, and is analogous to the complaint in a civil action. (*In re Saunders* (1970) 2 Cal.3d 1033, 1047 [88 Cal.Rptr. 633, 472 P.2d 921].) The traverse is equivalent to the answer in a civil suit, and may

controvert any material matters set forth in the return. (Pen. Code, § 1484; *In re Saunders, supra.*) More relevant here, a petition may except to the legal sufficiency of the return, in a manner similar to a civil demurrer, where the factual allegations of the petition are uncontroverted. (*In re Saunders, supra,* at p. 1048.) Here, by way of return the People pleaded lawful judgement of conviction for second degree murder and denied the petition's allegations of incompetency of counsel. Defendant then moved for relief as a matter of law. We therefore review the matter purely as a question of law on an undisputed record.[4]

■ 2. *Incompetency of Counsel.* "It is counsel's duty to investigate carefully all defenses of fact and of law that may be available to the defendant, and if his failure to do so results in withdrawing a *crucial* defense from the case, the defendant has not had the assistance to which he is entitled. [Italics supplied.]" (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].) On this issue defendant bears the burden of proof. Defendant asserts counsel's failure to discover and investigate his possible epileptic seizures effectively withdrew his potential defense of diminished capacity and reduced his trial to a farce and a sham. (*Ibarra, supra,* p. 466.) We disagree.

The proper test to determine adequacy or inadequacy of investigation by counsel is whether counsel's original inquiry was adequate in the light of issues present in the case and of relevant facts that he knew or should have known at the time of his inquiry. (*People* v. *Stanworth* (1974) 11 Cal.3d 588, 613 [114 Cal.Rptr. 250, 522 P.2d 1058].) ■ A defendant is constitutionally entitled to counsel who is reasonably effective, not one who is errorless. (*In re Saunders* (1970) 2 Cal.3d 1033, 1041 [88 Cal.Rptr. 633, 472 P.2d 921].) Counsel is not required, or permitted, to suggest to a defendant the occurrence of facts and circumstances which, if adopted by the latter, would provide additional defenses to the charges against him. In plain English, counsel is not employed to make up his client's story or invent mitigating circumstances. Failure or shortcomings in counsel's efforts will not justify habeas corpus relief unless the failure to investigate or raise issues withdraws a crucial defense which reduces the trial to farce or sham. (*People* v. *Ibarra, supra,* 60 Cal.2d 460.)

■ Assertions that a defendant has had epileptic seizures in the past, even if true, are not a defense to murder, absent evidence of a seizure at

---

[4]The testimony of trial counsel on the motion for reconsideration will be deemed part of the People's return. The only factual dispute we perceive concerns the time that trial counsel was made aware of defendant's history of possible epilepsy.

or about the time of the murder. Defendant produced no such evidence and made no claim of epileptic seizure to his counsel. None of the witnesses to the events surrounding the murder gave any accounts that would suggest epileptic seizure. (*People* v. *Duren* (1973) 9 Cal.3d 218, 236 [107 Cal.Rptr. 157, 507 P.2d 1365].) The physical manifestations of a grand mal epileptic seizure (motor convulsions and loss of consciousness), which defendant may have suffered in the past,[5] would preclude an appearance of normal functioning. This was not the case here, since there were no indications at trial that defendant's conduct at the scene of the crime appeared abnormal in any respect. Rather, the record indicates that prior to trial defendant told counsel he was intoxicated, he blacked out after the fight, and did not regain consciousness until immediately prior to the shooting. Accordingly, any assertions of incompetency of counsel for failure to investigate center on the question whether counsel's failure to inquire further into additional possibilities to support defendant's claimed unconsciousness immediately prior to the time of the murder removed a crucial defense. We think not.

■ Diminished capacity may be predicated upon extreme intoxication, trauma, or mental disease, the existence of which precludes capacity to form specific criminal intent. (*People* v. *Conley* (1966) 64 Cal.2d 310, 316, 319 [49 Cal.Rptr. 815, 411 P.2d 911].) Psychomotor epilepsy, also known as an epileptic fugue mental state, is an alternative basis for diminished capacity, as would be certain forms of brain disease. (Cf. *People* v. *Williams* (1971) 22 Cal.App.3d 34, 38 [99 Cal.Rptr. 103].) But there is not the slightest indication in the record that defendant was afflicted with such physical or mental conditions, or that further investigation would have revealed some type of epilepsy other than grand mal or some dishabilitating brain disease.

■ Here prior to trial defendant's counsel Johnson knew defendant's claim of intoxication at the time of the murder; reviewed the transcript of the prior trial; knew Officer Renk had testified that Singleton had said defendant shouted "Don't do it" immediately before the shooting; went over trial strategy and tactics with former counsel; and knew the law of diminished capacity. With knowledge of the foregoing Johnson determined the best defense would be to prove that defendant had consciously attempted to prevent the crime. Defense strategy directed toward proof that defendant did not aid and abet the crime and consciously sought to prevent the occurrence of the murder is

[5]Records from Doctor's Hospital in Compton dated December 28, 1970, state that Grissom reportedly had had four grand mal seizures prior to admittance (appen. A).

pragmatically inconsistent with a diminished capacity defense, under which actual criminal complicity and participation is legally excused or mitigated because of the accused's temporarily impaired mental condition. (*People* v. *Corona* (1978) 80 Cal.App.3d 684, 716 [145 Cal.Rptr. 894].) While it is possible to logically reconcile these defenses by a precision timing which shifts defendant's mental state from consciousness to unconsciousness and back to consciousness at precisely the right moments, such logical reconciliation tends to be unpersuasive with jurors, who are inclined to look on inconsistent multiple defenses as lawyers' choplogic. In this and similar cases a choice of defense must ordinarily be made, in that a defense of diminished capacity tends to dilute the force of a defendant's vicarious claim that he consciously tried to dissuade his confederate from pulling the trigger. Additionally, effective presentation of a diminished capacity defense would impel defendant to take the stand and assume the risks of self-incrimination that accompany a defendant's appearance as a witness. According to Johnson's testimony, defendant did not wish to take the stand.

Accordingly, any failure to investigate defendant's medical history and obtain psychiatric opinion on defendant's mental condition at the time of the murder did not result in the withdrawal of a crucial defense. Attorney Johnson knew defendant's claim of intoxication prior to the homicide and knew that diminished capacity based on intoxication was available as a defense. Yet as a matter of trial strategy he knowingly and intelligently rejected that defense in favor of another, a defense of nonparticipation in the murder, presented indirectly through the testimony of a police witness. That defense had worked well enough at the first trial to produce a hung jury, a result substantially equivalent to acquittal except for the possibility of retrial. Why throw in what appears to be a winning hand? Indeed, if counsel at the second trial had persuaded his client to adopt a different defense and take the stand, and if thereafter his client had been convicted, the identical claim of incompetency of counsel made here could be made there on the ground that counsel's new defense undercut the merits of the earlier partially successful defense and made the second trial farce and sham. Defendant's present contention necessarily charges that both his former counsel and his second counsel, Arnold Johnson, were incompetent, in that both pursued the same defense. We think the charges are unwarranted.

■ Finally, defendant contends that counsel's failure to obtain a psychiatric examination prior to trial ipso facto demonstrates incompetency in that such an examination might have turned up evidence of some

other type of disease, which defendant could then have used to advantage, that failure to ask for and obtain such an examination amounts to a kind of negligence per se which automatically compels reversal of the judgment. But psychiatric examination to what purpose? Defendant already had available his defense of diminished capacity as a result of asserted severe intoxication and beating. A psychiatric examination to discover some form of disease not referred to by defendant and not suggested by witnesses would add nothing of substance to available defenses. We have reviewed the posttrial psychiatric examination and find nothing therein to suggest withdrawal of a crucial defense. Its basic diagnosis is "Alcoholism, episodic excessive drinking (with severe acute intoxication at the time of the present offense) (with hypochondriacal features) (with questionable epilepsy)." (Appen. B.) This is essentially the same information that defense counsel had available before trial at the time he was planning his defense. Appellate counsel for defendant seems to suggest that criminal trial lawyers, regardless of their client's statements, must practice a kind of defensive medicine that requires them to order every conceivable test on the defendant in the hope that something will turn up, tests they forego at peril of being branded incompetent. On this theory, tests become necessary for their own sake and not for their relevancy and materiality to defendant's story. The issue shifts from one of credible defense to one of exhaustive investigation. Incompetency of counsel tends to become equated with failure to secure a successful result, i.e., an acquittal. Carried to this extreme, the theory loses sight of the need for relevancy and materiality in investigation.

We conclude that knowing waiver of the defense of diminished capacity, albeit on grounds independent of possible epileptic condition, in favor of a defense based upon conscious opposition to the murder, precludes assertions of incompetency based on the hindsight and speculative argument advanced in the petition for habeas corpus. The order of the trial court granting habeas corpus relief and vacating the judgment of conviction is reversed.

Roth, P. J., and Compton, J., concurred.

A petition for a rehearing was denied November 21, 1978, and on November 15, 1978, the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied December 20, 1978. Bird, C. J., was of the opinion that the petition should be granted.

APPENDIX "A"

[Crim. Nos. 29868 and 30835. Second Dist., Div. Two. Oct. 19, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.                    (Sup.Ct. No. A 319845)
BOOKER T. CLARENCE GRISSOM, Defendant and Appellant.

OPINION

ROTH, P. J.—A fight erupted in the early morning hours of August 11, 1975 between Amaya, Cortez and Ramirez, on the one hand, and appellant and Richard Singleton, on the other; the latter two had apparently followed three women whom appellant had initially accosted from his car. The fight lasted about twenty minutes and ended with Singleton's and appellant's retreat from the scene. There was evidence that appellant had received the worst of it, having been struck several times with a pellet gun and belt while lying on the ground.

An hour after the fight ended, appellant and Singleton returned to the scene, the latter carrying a shotgun, and found Murcia and Estrada, the eventual victim, seated in a truck. Appellant and Singleton knocked and entered two apartments successively, Singleton kicking in the first door, but nothing happened. Then Singleton pointed the shotgun at Murcia who gave the peace sign; Singleton put the weapon down. Estrada then got out of the truck and Singleton fired at a range of 30 or 40 feet, killing him.

Singleton and appellant were tried together and the jury convicted the former of second degree murder. A mistrial was declared as to appellant (the jury was deadlocked), he was retried and found guilty of second degree murder. In addition to his appeal, he had filed a petition for a writ of habeas corpus which we have consolidated with the appeal.

The principal contention on appeal is that appellant was denied the effective assistance of counsel inasmuch as evidence showing his mental incapacity was not presented to the court until the motion for new trial at which time the trial court ruled that the same evidence had "been readily available and with due diligence" could have been produced at trial "for whatever purpose it could have served."

Appellant's defense was based on Singleton's testimony at the first trial which conceded the fight and the fatal shooting for which Singleton accepted responsibility. Singleton had also testified that immediately prior to the shooting appellant had said "Don't do it." In addition, there was some evidence in the form of two closed cans of beer and a wine bottle in appellant's car tending to show that appellant had been drinking. However, this was controverted by eyewitness testimony of a police officer who stated that appellant appeared to be sober shortly after the shooting.

The motion for a new trial was buttressed by a comprehensive set of medical records of Doctors Hospital in Compton prepared on or about December 28, 1970, when appellant was admitted with the complaint that he had suffered four grand mal seizures that day. The medical history contained in these records states:

"Date   12-28-70      Hour_____a.m.
                                    p.m.

"The patient is a 25 year old Negro who is reported to have had four grand mal seizures during the course of the day. He was seen in the Emergency Room because of these and because of general status and other problems, he was admitted to the hospital for work-up and care. He states that he has had seizures in the past when he was a child, but these ceased by age four and he has had no further seizures since that time. He began to have problems with depression and some mental changes about one year ago and has been seeing a Psychiatrist for approximately 6 months. Shortly before that time, he was noted to be having visual hallucinations and to have had a marked change in his mental status. Because of these symptoms, he was placed by a Psychiatric Social Worker, Miss Joan Policy, Telephone: 631-8675, on Triavil which he has been taking six times per day. He was instructed, however, to take only three times per day. In addition, his wife states that he has been taking Amphetamines, although he states that he has not been taking them for well over a month and has had no other medications. He has been drinking heavily, however, on the week-end, although he states that he only had an occasional beer. His wife reports him to have been drinking fairly heavily over the past week-end. He is currently alert and has no complaints of any major problems. He denies paralysis, numbness or other seizures prior to the present illness.

"PAST MEDICAL HISTORY: He had the usual childhood diseases without significant complications. He denies significant adult illnesses. He denies surgery. He denies known allergies. He has had penicillin in the past.

"FAMILY HISTORY: His mother and father are both alive and well. There is no family history of neurologic disorder.

"SOCIAL HISTORY: He was born in Los Angeles. He is currently unemployed. He smokes approximately one pack per day. He states that he drinks beer. He is married.

"REVIEW OF SYSTEMS: In general, he has been in good health.

"HEENT: He has mild problems with hearing. Otherwise, within normal limits.

"CARDIOVASCULAR-RESPIRATORY: He has no dyspnea, edema or chest pain.

"GASTROINTESTINAL: He has no melena, gas, diarrhea, or constipation.

"GENITOURINARY: He denies urinary tract infection, dysuria or veneral [sic] disease.

"ENDROCRINE: Denies weight gain or loss, plyuria or polydyspia.

"MUSCULOSKELITAL: Denies joint pain or swelling.

"NEUROLOGICAL: See history of present illness.

"PSYCHOLOGICAL: See history of present illness.

"HEMOTOLOGIC: Denies anemia, bleeding or white cell abnormality.

/s/   Charles Seard    , M.D."

The discharge summary dated December 31, 1970 states:

"Patient is a 25 year old Negro male who was admitted to the hospital because of having had four grand mal seizures on the date of admission. At the time of his admission

he was post ectal [*sic*] but had no localizing signs. Physical examination was entirely within normal limits.

"Lab data: Lab data at that time revealed a hemoglobin 15.3, white count and differential were normal. Fasting blood sugar was 102, two hour post prandial was 140. VDRL was non-reactive. He had skull series performed which was within normal limits. Lumbar puncture revealed an opening pressure of 270 with the patent tense, closing pressure 240. The spinal fluid was clear and colorless. Spinal fluid cell count was 1 WBC, protein 32, chlorides 125, glucose 75. VDRL was non-reactive. Colloidal [*sic*] gold curve was all zero. Echoencephalogram was within normal limits. Brain scan was also within normal limits. Chest x-ray was normal, electroencephalogram has been performed but has not been reported at the time of this dictation.

"The patient was seen in consultation by Dr. Roberson to rule out possible space occupying lesion. It was his feeling that such lesion probably did not exist although an arterovenous [*sic*] malformation might exist. The brain scan however ruled out this diagnosis. He is therefore being discharged as maximum hospital benefit.

"DISCHARGE DIAGNOSIS:   1. Seizure disorder
                                   2. Rule out diabetes mellitus
                                   3. Probable drug overdose

"Medications: Phenobarbitol 30 mg. tid. Follow up will be in my office within two weeks and with Dr. Edwin Williams for neurology follow up within one month."

Also included as part of the motion for new trial is a letter of June 9, 1976, written to appellant's trial defense counsel by a Regional Chief (Southeast) of the Department of Health Services of the County of Los Angeles after the jury reached its verdict:

"The above-named patient was treated at Southeast Mental Health Service from September 1970 to August 1971. He was seen six times on an out-patient basis. Three of these visits were conjoint sessions with his wife. Mr. Grissom never made an appointment but was always seen on an emergency basis as a result of a crisis, and he independently terminated his visits after August 24, 1971.

"He presented the problem as his wife's infidelity, and appeared to be experiencing persecutory delusions, as his suspiciousness of his wife seemed groundless. He appeared to be highly agitated during the interviews and complained of episodes of uncontrollable shaking and sleeplessness, which he has experienced over the past 10 years.

"Mr. Grissom was placed on various medications. The last medication he received was on January 20, 1971 and consisted of Stelazine 10 mg, bid, Artane 5 mg, I bid, and Dalmane 30 mg, I hs.

"His closing diagnosis was Schizophrenic Reaction, Paranoid Type, and his condition at the time of discharge was listed as treated but unimproved.

/s/   Rose D. Jenkins   , M.D.
Regional Chief"

Appellant has brought to our attention the diagnostic study prepared pursuant to Penal Code, section 1203.03 with which we have augmented the record on our own motion . . . .

We also have before us affidavits of two of appellant's sisters filed in support of the petition for a writ of habeas corpus which aver: appellant's trial attorney was told of

appellant's medical history during trial; the records of Doctors Hospital were given to him prior to the verdict; the family has a history of epilepsy;[1] and counsel reputedly told the sisters that the medical background would not help appellant during his trial but might be helpful after that.[2]

Appellate defense counsel has also filed a declaration in support of the petition:

### "DECLARATION OF JONATHAN B. STEINER

"I, JONATHAN B. STEINER, declare and say that:

"On Friday, June 24, 1977, I spoke with Booker T. C. Grissom on the telephone from San Quentin Prison.

"Mr. Grissom told me that he spoke with his trial counsel, Arnold Johnson, while he was confined in county jail pretrial. Mr. Grissom stated that he told Mr. Johnson that he had been drinking gin and beer all during the day on August 10, 1975. He stated that he told Mr. Johnson that he had blacked out during that day due partially to the fact that he was drunk and partially to the fact that he was an epileptic and had a history of epileptic seizures.

"Mr. Grissom stated that Mr. Johnson never asked and Mr. Grissom never volunteered why Singleton was driving Grissom's car on the day of the homicide. The reasons that Singleton was driving Grissom's car were that Grissom was an epileptic, that he had had his driver's license removed because of that problem and that he had once had an accident due to a seizure while driving.

"On June 24, 1977, I also spoke to appellant's counsel at the first trial in the instant case. . . . [He] recalled that Mr. Grissom did stated to him several times that he was an epileptic and had a history of seizures. Mr. Grissom also told [him] that he was extremely intoxicated on August 10, 1975.

"I have spoken with Dr. Rose Jenkins. She indicated that the records of her facility indicate that petitioner was seen nine times by a psychiatrist[3] there before he independently terminated his treatment. She reiterated that he was diagnosed as 'untreated'[4] at that time.

"Finally, I spoke with Arnold N. Johnson, petitioner's trial attorney, on July 5, 1977. Mr. Johnson stated that he received the medical records from Morningside Hospital and USC-LA County Medical Center pursuant to a subpoena duces tecum on or about May 18, 1976. [See *text, infra.*] These are the records which indicate that petitioner may have had a seizure during the time he was drinking with Singleton the day before the homicide.

"Further, Mr. Johnson indicated that petitioner told him that petitioner had 'blacked-out' and that he was extremely drunk that day, August 10, 1975.

---

[1] The medical history reproduced above states to the contrary.

[2] One of the sisters avers that counsel said he wished he would have had the records "earlier."

[3] Dr. Jenkins' letter of June 9, 1976, *supra,* text, states that appellant was seen six times at the facility, only three of which sessions were with him alone.

[4] The Jenkins letter reflects that appellant was diagnosed "treated" but unimproved.

"He further indicated that he never considered making a motion to have the trial court appoint a psychiatrist to examine petitioner regarding his mental or emotional state at the time of the homicide.

"Executed under penalty of perjury in Los Angeles, California on July 6, 1977.

"/s/   JONATHAN B. STEINER        "

The Morningside Hospital record referred to in the Steiner affidavit is dated August 11, 1975 (the day of the shooting) and is summarized in yet another affidavit:

"From Morningside Hospital, I [Steiner's assistant] obtained a copy of the 'Medical Treatment Record' of appellant on the date of August 11, 1975. The records reflect that appellant was brought to the hospital by a police car for treatment.

"In the lower left corner of appellant's 'Medical Treatment Record,' there is the comment '[H]ad possible seizure-prob. just severe anxiety.' (The document also states 'very anxious' and 'IMP-ANXIETY.') The document indicates that appellant was taken from Morningside to the 'USCMC jail.'

"At the Los Angeles County USC Medical Center, I viewed the records made at the time of appellant's visit to that facility on August 11, 1975. The hospital would not allow me to make a copy of their records. There was a comment, however, that the examining physician recommended that appellant be observed for 'seizures.' "

Appellant contends:

"It is clear from the record of the instant case that the 'crucial defense' of diminished capacity was withheld from appellant's trial. It is also clear that this defense was withheld not through deliberate though faulty judgment on the part of appellant's trial counsel, but because, taking him at his word, he was unaware of the facts which would give rise to the defense."

Appellant's case was called for trial on May 11, 1976; the jury was impaneled on May 18 and, following the trial, the matter went to the jury on June 2, 1976.

Appellate defense counsel's own declaration states that the Morningside Hospital records were obtained by trial counsel on May 18 which, as noted, was the day the jury was impaneled. The affidavits of appellant's sisters aver that the medical records of Doctors Hospital was given to trial defense counsel during the trial. And Mr. Steiner's own declaration quotes appellant as having specifically informed defense counsel *prior to trial* that he was an epileptic and had been drinking heavily on the day of the homicide.

Appellate defense counsel's claim that trial counsel was not aware of the facts which may have given rise to the defense of diminished capacity amounts to a misstatement of the record and the evidence produced by appellate defense counsel himself.

Trial defense counsel made the following argument in support of the motion for a new trial insofar as it related to the medical evidence:

"In talking to—in interviewing the defendant prior to the trial and during the trial, there was an indication as to the reason why Singleton had been driving the throughout the proceeding—throughout the day of the crime on August 11, 1975.

"It wasn't until after the trial that I spoke to one of his relatives who had been ill throughout the course of the trial and they indicated to me that he was an epileptic, and that he had an accident as a result of having a seizure.

"As a result of giving me this information, I immediately subpoenaed his medical records and I also found out that he had been treated for paranoia and schizophrenia which possibly could have been the inhibiting factors which caused him not to communicate that fact to me.

"It was a material fact as far as I was concerned, primarily because the charge basically was aiding and abetting, and certainly it was argued that he had given—Booker had given the car to Mr. Singleton knowing that he was about to commit a crime, which is certainly not the case based on this subsequent information that I was given."

Counsel's initial reference to "an indication as to the reason why Singleton had been driving . . . throughout the day of the crime . . ." suggests an awareness of the facts recited in the fourth paragraph of the Steiner declaration. Be that as it may, however, we are forced to conclude in light of the uncontroverted evidence adduced by appellant that trial defense counsel was in fact fully aware, and in possession of, the medical evidence prior to the close of trial.

This of course suggests that trial counsel was less than candid with the court when he disclaimed any knowledge of the epileptic condition. However, a review of counsel's extended argument in support of the motion for a new trial reveals that counsel was in substance contending that appellant's mental condition had prevented him from communicating all the facts of a possible seizure on the day of the crime to defense counsel. Thus:

"THE COURT: Again, we must bear in mind that even though the medical certificate is dated June 9, 1976 [Dr. Jenkins' letter], it refers to treatment back in 1970 to August of 1971, which is nothing new.

"It is not newly discovered evidence.

"MR. JOHNSON [defense counsel]: But, Your Honor, that could be the cause for suppressing the particular factors dealing with the seizure. Again, not being a psychiatrist and being able to analyze the meaning of the various characteristics, I think that the defendant should have the opportunity to at least bring before the court, so it could make its determination whether or not there was such a disability as far as communicating the factor of the seizure. I believe that it was a very important matter as far as the defense is concerned."

The claim that appellant could not adequately communicate the fact of his seizure to trial defense counsel is specifically rebutted by Mr. Steiner's declaration, which, as noted, quotes appellant directly to the contrary.

It goes without saying that, had the trial court been aware of all the evidence produced in support of the petition for a writ of habeas corpus, it would have reached the conclusion that the evidence was not "newly discovered" with much less difficulty and much less argument.

We do not approve of trial defense counsel's apparent lack of candor but we do note that the gist of his efforts appears to have been directed at getting appellant's medical history before the trial court. The success of this strategy is demonstrated by the trial court's statement and ensuing order: "It is my intention, anyway, Mr. Johnson, upon

ruling on this motion that the motion is denied, and to refer the defendant under 1203.03 *merely because of the medical testimony.* I don't believe that this defendant is to any lesser degree guilty than the codefendant, it is *because of the medical evidence* that I would be inclined to invoke the provision of 1203.03." (Italics added.)

As has been noted on innumerable occasions, appellate courts, and appellate counsel, do not exist to continually second-guess the trial strategy of counsel who bear a heavy responsibility in the conduct of the trial. At bench, we have, in substance, defense counsel's decision not to present six to seven-year-old medical evidence which, upon careful scrutiny, does not contain a single objective item of proof, apart from appellant's own assertions, that he was or is an epileptic. The thorough medical examination conducted at Doctors Hospital boils down to a finding that appellant's problems stemmed from a "probable drug overdose." Dr. Jenkins' letter attests to nothing other than mental disturbance (then six years in the past) which has not even a remote connection to the day, or fact, of the homicide. We conclude that trial counsel's decision not to base a claim of mental incapacity on nonexistent evidence was nothing other than sound.[5]

Appellant also contends the trial court erred when it allowed the prosecutor to read the former testimony of Officer Renk regarding Singleton's statement to the officer: "The only thing that I remember Booker was saying 'Don't do it.'" Appellant asserts the admission of Officer Renk's statement regarding what Singleton had stated to Renk denied appellant his constitutional right to cross-examine witnesses (i.e., Officer Renk).

The objection at trial was not made on the grounds urged on appeal:

"MR. JOHNSON: I would be opposed to that, your Honor. There is testimony given by the police officer that he left the statement 'Don't do it,' out, because he was not interested in it.

"If you are going to bring the statement—the written statement in to show that Mr. Singleton did not mention 'Don't do it,' I think that would be unfair. I think you would have to bring in the officer's statement as to why he did not include 'Don't do it' into the written statement, because it was the police officer who used his own handwriting to write the written statement."

Questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection at trial on the ground sought to be urged on appeal. (*People* v. *Welch* (1972) 8 Cal.3d 106, 114-14 [104 Cal.Rptr. 217, 501 P.2d 225]; *People* v. *Robinson* (1965) 62 Cal.2d 889, 894 [44 Cal.Rptr. 762, 402 P.2d 834].) Moreover, the trial court properly allowed the testimony pursuant to Evidence Code section 356. Section 356 provides in relevant part: "Where part of [a] . . . conversation . . . is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; . . . and when a detached . . . conversation . . . is given in evidence, any other . . . conversation . . . which is necessary to make it understood may also be given in evidence."

*People* v. *Ketchel* (1963) 59 Cal.2d 503, 536 [30 Cal.Rptr. 538, 381 P.2d 394] holds: "'In the event a statement admitted in evidence constitutes part of a conversation . . . , the

[5]One of appellant's sisters makes this revealing statement in her affidavit: "[Defense counsel] said he wished he had the [medical records] at the beginning of trial. He said that the information would not help my brother at that time. He stated that all he could do would be to present the papers to the judge after the trial." The same affiant was "sure" that the records had been given to defense counsel either while the jury was being chosen or during the presentation of the prosecution's case.

opponent is entitled to have placed in evidence all that was said . . . by or to the declarant in the course of such conversation . . . , provided the other statements have some bearing upon, or connection with, the . . . declaration in evidence and are not excluded by a rule of law other than the hearsay rule.' "

At bench, the defense had already introduced part of the Singleton-Renk conversation when the cited portion of Renk's testimony was read into the record.

Respondent concedes that the judgment must be modified to delete the finding pursuant to Penal Code, section 12022.5 that appellant had used a firearm. (*People* v. *Walker* (1976) 18 Cal.3d 232 [133 Cal.Rptr. 520, 555 P.2d 306].) Accordingly, the judgment is modified by striking therefrom the finding that appellant had used a firearm at the time of the commission of the offense.

The judgment is affirmed as modified. The petition for a writ of habeas corpus is denied.

NOT FOR PUBLICATION.

Fleming, J., and Compton, J., concurred.

APPENDIX "B"

PSYCHIATRIC EVALUATION

IMMEDIATE CIRCUMSTANCES: Mr. Grissom is a thirty-one year old separated Negro man convicted in Los Angeles County Superior Court on a charge of Murder Second Degree and sent here for pre-sentencing evaluation.

BACKGROUND INFORMATION: The offense occurred in August, 1975, a year before the present interview. The delay seems to have been the result of a hung jury at the original trial, after which a jury convicted him at a second trial. His crime partner, Richard Singleton, was also convicted on the same charge and is currently serving a state prison sentence. The offense was the shooting of a twenty-two year old Mexican-American man at a parking lot in South Los Angeles. It appears that the fatal wounds were due to a shotgun blast fired by Mr. Singleton. Apparently the two men had been involved in an argument with some Mexican-American men in that area, then went home to obtain the shotgun and returned to the scene. The victim is described as an innocent bystander, who had not taken part in the original quarrel. As Mr. Grissom recalls the episode, he and his friend had been drinking and were accosting some women in the area when a group of men interfered. In the course of the quarrel he claims that he was attacked and slightly injured. He claimed to be unable to recall how the gun was obtained, and also claimed that he tried to keep Mr. Singleton from firing it. He has a lengthy prior record of arrests related to marijuana and drinking and, about one month before the homicide, had been granted probation on a Heroin Possession charge. He claims to suffer from "nerves," high blood pressure and epilepsy, has been unable to work, and receives a disability allowance. In this facility he has been taking Dilantin. He had one unsuccessful marriage, producing two children. He is a 10th grade drop-out whose employment, prior to disability, was varied and unskilled. He has a mother and two sisters who are, apparently, still interested in him.

MENTAL STATUS: On interview he is cooperative, rather shy and withdrawn, communicates satisfactorily, and appears of average intelligence without signs of psychosis. He does not have the appearance of an epileptic personality, but there are many hypochondriacal indications, with a tendency to find physical reasons for non-performance, and a current complaint of numbness in the hands which seems to be on a functional basis. He indicates that he has had no seizures during the entire year that he

has been in custody, and this raises a strong suspicion that alcohol may have been responsible for his seizures and that they are relieved when he no longer has the opportunity to drink. He says he would like to get probation, return to live with his mother, and get some kind of job, mentioning that he is a capable auto mechanic, and adding that he would like to take courses to become better skilled at business and perhaps some day operate a clothing store. As he describes the homicide incident, he was merely a spectator, recalls that he and his friend, Mr. Singleton, had an argument with a group of Mexicans, that he was beaten, and that they both left the scene with Singleton driving the car, but he does not actually recall the ride because of his deeply intoxicated state. He says he again became aware of his surroundings when they were back at the place where the assault had occurred; he saw Singleton with a shotgun in his hands (the origin of which he did not know), and Singleton told him "I'm going to kill somebody." He says almost immediately after that Mr. Singleton fired the weapon at the victim, who was fatally injured, and the two of them fled again in the car but were arrested shortly afterward. He says he now understands that alcohol has been a serious problem to him, and intends never to drink again.

This is a man with a chronic alcoholic problem, who seems to have been involved in this homicide largely as a spectator, at a time when he was deeply intoxicated on alcohol, and barely knew what was happening. From the description of the incident, it does not seem that he himself had hostile intentions toward the victim. He has also had a drug problem, but I believe that, considering the lapse of a year's time, and the rather passive role that he assumed in the homicide, a trial on probation is now indicated.

PSYCHIATRIC DIAGNOSIS: (303.0) Alcoholism, episodic excessive drinking (with severe acute intoxication at the time of the present offense) (with hypochondriacal features) (with questionable epilepsy).

PROGNOSIS: Necessarily guarded, but probably able to make an acceptable adjustment without danger of antisocial behavior if further use of alcohol and drugs is avoided.

RECOMMENDATIONS: Probation, with special emphasis on avoidance of alcohol and drugs, with an understanding that any use of these substances will result in revocation of probation. There should be a careful medical evaluation to determine whether he does, in fact, have epilepsy independent of his drinking, to determine what level of occupational disability he has, and to make realistic recommendations for work and vocational training. In view of the year of custody already sustained, I do not believe that additional custody as a condition of probation would be desirable.

8-16-76

/s/ Jack Levitt, M.D.,
Psychiatric Consultant