[No. S004450. Crim. No. 22630. June 22, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
KENNETH DERREL WILLIAMS, Defendant and Appellant.

[Crim. No. 24736. June 22, 1989.]

In re KENNETH DERRELL WILLIAMS on Habeas Corpus.

1116

## COUNSEL

Eric S. Multhaup, Melissa W. Johnson, under appointments by the Supreme Court, Douglas R. Greer and Loretta H. Hellen for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, James T. McNally, Michael J. Weinberger, Edmund D. McMurray and Thomas Y. Shigemoto, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

KAUFMAN, J.—Defendant and his brother Fredrick Williams were indicted in Placer County for the rape (Pen. Code, § 261, subd. (3)),[1] robbery (§ 211), kidnapping (§ 207), kidnapping for purposes of robbery (§ 209) and murder (§ 187) of Heather Mead. Both men were also charged with burglary. (§ 459.) Special circumstances of murder committed during the commission or attempted commission of rape, robbery, kidnapping, kidnapping for purposes of robbery and burglary were alleged (§ 190.2, subd. (a)(17)), as were allegations of having been armed with (§ 12022) and of having personally used a firearm during the commission of the offenses. (§ 12022.5.)

The trial court denied a joint pretrial motion for change of venue. The trials were subsequently severed and defendant was tried first. During the jury selection, defendant renewed his motion for change of venue. The trial court again denied the motion. The jury returned guilty verdicts on all counts and found true all the special circumstance and most of the enhancement allegations.[2] The jury fixed the penalty at death. Appeal is automatic. (§ 1239, subd. (b).)

---

[1] Unless otherwise specified all statutory references herein are to the Penal Code.

[2] The jury found that defendant had not used a gun during the rape and burglary and was not armed during the rape.

Following defendant's conviction, the deputy district attorney indicated that he would not seek the death penalty against defendant's brother, Fredrick, but rather would seek life without possibility of parole. Fredrick thereupon renewed his motion for change of venue. The trial court denied the motion. Fredrick then sought extraordinary relief from this court. We issued an alternative writ and thereafter a peremptory writ of mandate directing the trial court to grant a change of venue. (*Williams* v. *Superior Court* (1983) 34 Cal.3d 584 [194 Cal.Rptr. 492, 668 P.2d 799].)[3]

We have concluded that here, as in the case of defendant's brother, *Williams* v. *Superior Court, supra,* 34 Cal.3d 584, the trial court erred prejudicially in denying defendant's motion for change of venue. Defendant's judgment of conviction, therefore, must be reversed.

Set forth below is a summary of the evidence adduced at trial, followed by a separate statement of the facts and the law concerning the venue question.

FACTS

1. *Guilt Phase Evidence*

A. *Prosecution Case*

On June 12, 1980, at approximately 5:20 a.m., the lifeless body of a young woman, Heather Mead, age 22, was found on Industrial Boulevard near Roseville in Placer County. She had been shot five times. An autopsy revealed that Mead had sustained three gunshot wounds to the head, one to the abdomen and one to the thigh. At least two of the shots had been fired from a distance of three to five feet. The time of death was estimated to have been between 3 and 4 that morning. Based on the location of the wounds, the amount of blood and the presence of the expended bullets, the investigating officer, Detective Johnnie Smith of the Placer County Sheriff's Department, concluded that Mead had been shot at that location.

The autopsy also revealed that Mead had engaged in sexual intercourse within two to twenty-four hours prior to her death, and that she had been either a virgin or sexually inexperienced.

Mead was a resident of Roseville in Placer County. During the week preceding her death, however, she had been house-sitting for her vacation-

[3] The brother's case was subsequently transferred to Sacramento County, where he entered a negotiated plea of guilty to the rape and robbery counts and the remaining charges were dismissed. He was sentenced to an aggregate term of nine and one-third years.

ing aunt and uncle, Fred and Bettie Graham, at their residence on Roble Way in the North Highlands section of Sacramento.

On the evening of June 10, the day before the murder, Mead had dinner with her fiance, Bruce Pfeiffer. Pfeiffer testified that he left her that evening at the Graham residence and returned to the naval base where he was stationed. He stated that during the four and one-half years he had known Mead, they had never engaged in sexual intercourse.

Later that evening, Mead went to Jeffrey Kearney's residence and spent the night there. Kearney testified that he and Mead had been close friends but, like Pfeiffer, denied that they had ever had sexual intercourse. Before Mead left for work the next morning, June 11, she arranged to meet Kearney that evening at a bar called the Blue Lantern in Roseville. The meeting would never take place.

Mead worked as a "gofer" for Atteberry and Associates, an engineering and consulting firm in Roseville owned by her aunt, Susan Atteberry. Mead's aunt and uncle, Fred and Bettie Graham, also worked for Atteberry and Associates. On June 11, 1980, Mead was told she could leave work about 4 p.m. She informed a coworker that she planned to meet Kearney that evening.

On the same day, about 1:30 p.m., Kevin McGruder was driving to his home in the North Highlands section of Sacramento when he saw defendant, an acquaintance from high school, walking on the street. McGruder gave defendant a ride to his (McGruder's) house, which was located on Roble Way, next door to the Grahams' residence. Upon their arrival, McGruder and defendant heard shouting and went into the backyard where they encountered Mrs. Gahan, the neighbor who lived on the other side of the Grahams. Mrs. Gahan was upset because the Grahams' dogs were running loose. She told McGruder that the Grahams were not at home (McGruder recalled that she said they were "on vacation") and that she was concerned because the dogs were unattended. Defendant was present during this conversation. Shortly thereafter, the two men separated.

Later that evening, McGruder was driving home from work when he saw defendant's brother, Fredrick Williams, at a neighborhood Circle K store. He stopped and gave Fredrick a ride to his (McGruder's) home. When they arrived, McGruder observed Fredrick put on a pair of black gloves and walk across the street to a park. McGruder noted a white Chevrolet Impala parked in the Grahams' driveway. He had seen it there before. The car belonged to Heather Mead. The time was approximately 12:30 a.m.

At approximately 1:15 a.m., McGruder was in his bedroom watching television when he heard a sound like glass breaking from the direction of the Graham residence. A minute or two later, he heard a voice which he recognized as defendant's saying "stop crying" and words which sounded like the number "86." In an earlier statement to the police and in his preliminary hearing testimony, McGruder was far less certain that it was defendant's voice or that these were the precise words which he heard. In any event, McGruder called the Sacramento Sheriff's office at approximately 1:45 a.m. to report a disturbance next door. A few minutes later, two patrol cars arrived. Either through misinformation or a misunderstanding, however, the officers believed that the caller (McGruder) lived at 6835 Roble Way, which was in fact the Graham residence, and that the disturbance was at 6839 Roble Way, the Gahan residence. The officers observed some lights on and a figure, whom they took to be the caller, peering from a window of the Graham residence. A white Impala was parked in the driveway. The officers checked and "cleared" the Gahan residence and departed at approximately 2:08 a.m.

Approximately two hours later, about 4 a.m., Tammy French, defendant's girlfriend, received a telephone call from defendant at her residence in Marysville. Defendant told her that he was at a liquor store around the corner and that he was coming over. He said that he had left some items on the porch and asked her to take them inside. Ms. French went outside and found a jewelry box, gloves, gun holsters, a mask, a stethoscope, and two knives. As she was placing these in a bag, she saw defendant walking toward the house carrying a CB radio. Ms. French and defendant took the items upstairs. She noted that defendant appeared to have been recently sweating.

Defendant told Ms. French that a friend, Art Johnson, had driven him to Marysville (defendant did not own a car). He had a gun, which he unloaded, and explained that he had "found" or stolen it. Defendant stated that he intended to sell some of the jewelry and either sell or otherwise dispose of the gun.

Later that morning, June 12, 1980, defendant left for Sacramento. He took the gun and shoulder holster with him. At approximately 11 a.m., Kenneth Mitchell received a telephone call from defendant. Defendant asked if he wanted to buy a gun. Mitchell stated that he did and the two arranged a meeting at the home of Tony Armstrong, a mutual friend, in North Highlands. Mitchell purchased the gun (a .38-caliber pistol), a holster and some shells for $25. When defendant returned to Marysville that night, he told French that he had disposed of the gun.

Two days later, during the early morning hours of June 14, Mitchell was running from the Birdcage apartments in Sacramento, where he had been stealing "in-dashes" from parked vehicles, when he "lost" the gun that he had purchased from defendant. Later that morning, a newspaper delivery boy found the gun and turned it over to the Sacramento Sheriff's department. It was later determined to be the gun that fired the bullets recovered from Heather Mead's body. Fred Graham confirmed that the weapon in question was among the items that had been stolen from his residence.

On June 13, the day after the murder, the police found Mead's car parked one to two blocks from the residence of defendant's girlfriend, Tammy French. Defendant was arrested that evening at Ms. French's apartment. A CB radio identified as having come from Mead's vehicle, a key to Mead's car, Mead's prescription eyeglasses, several pieces of jewelry with the Grahams' name on them, and a Texaco credit card issued to Atteberry and Associates were recovered from the French residence.

Forensic evidence relating to hair, semen and fingerprints found at the various crime scenes was introduced at trial. Of the 10 or so hairs found in Mead's left hand, the state's expert testified that none could have come from defendant or his brother. However, Negroid hairs found on Mead's navel, pubic area and breast, and on the bed sheet recovered from Mead's bedroom in the Graham residence had characteristics similar to that of defendant and his brother. The experts were generally unable to say whether the hairs were more similar to one brother or the other.

Tests to determine blood type and secretor status were conducted on defendant and his brother; the blood types of Ms. Mead, Jeff Kearney, Bruce Pfeiffer and a third friend of the victim, Rod Zeller, were also determined.[4] Further tests were performed to determine each of the foregoing individuals' phosphoglucomutase (PGM) grouping.[5] The state's expert criminalist, Michael Saggs, testified that he ran similar tests on seminal material found on vaginal and vulva swabs taken from the victim, as well as on blood and seminal stains found on Mead's panties and on the bedsheet in Mead's bedroom. Based on these tests, Saggs concluded that defendant could not be eliminated as having had sexual intercourse with Mead, although it was also impossible to state categorically that neither defendant's brother nor the other persons tested had deposited semen.[6]

---

[4] Every person's blood or ABO grouping falls into one of four categories—O, A, B and AB. Most but not all people "secrete" their ABO type into other bodily fluids.

[5] Phosphoglucomutase or, PGM, is an enzyme found in human red-blood cells. Every person has one PGM type—either 1-1, 2-1 or 2-2—and that type is evident in the person's bodily fluids, such as blood, semen and vaginal discharges.

[6] Defendant was determined to be a blood-type O secretor, PGM 2-1; his brother to be a blood-type O secretor, PGM 1-1; Mead to be blood-type O, PGM 1-1; Kearny to be blood-

Julita Fong, a pathologist who testified for defendant, challenged Saggs's conclusions. Contrary to Saggs, Dr. Fong stated it was not possible to conclude unequivocally that the seminal material on the panties and the vaginal swabs was consistent with defendant's secretor or PGM status. Dr. Fong conceded, however, that her conclusions were based upon photographs of Saggs's test results, and would have been stronger if based upon an independent analysis of the samples.[7]

Evidence was also presented that defendant's fingerprints were found on a note in Mead's vehicle, and on a Stoney Ridge Enterprises business card found in the Graham residence.[8]

---

type B, PGM 2-1; Pfeiffer to be blood-type A, PGM 2-1; Zeller to be blood-type O, PGM 1-1. Seminal material on the vaginal swabs had a secretor status type O with PGM 2-1 activity. The vulva swabs contained seminal material deposited by a type O secretor with PGM 1-1 activity. On the panties, seminal stains revealed a type O secretor with PGM 2-1 activity and blood stains were type O with PGM 1-1 activity. On the bedsheet, seminal stains were of a type O secretor with PGM 2-1 activity.

Thus, Saggs's tests showed that the seminal material from the vaginal swabs and the seminal stains on the panties and bedsheet were consistent with defendant's blood type, secretor and PGM status. However, Saggs stated that he could not eliminate either Kearney or Pfeiffer as the source of the seminal material because he did not know their secretor status. Nor could he state categorically that neither defendant's brother nor Zeller had deposited semen, because PGM type 2-1 activity tends to mask type 1-1.

Seminal material on the vulva swab was not consistent with defendant's PGM type, but was consistent with both his brother and Zeller. Saggs stated that it was possible Mead's own vaginal discharges had interfered with the chemical tests of that material, although he indicated that the testing procedure was designed to control for that possibility.

[7] In a habeas corpus petition filed with this court (Crim. No. 24736) defendant has alleged that the report of an independent expert, Brian Wraxall, who had been jointly retained by defendant and his brother to examine the various blood and semen samples, was improperly withheld from defense counsel. Defendant's trial counsel assert that they were informed by Wraxall and counsel for defendant's brother that the independent analysis yielded no results. In fact, defendant contends that Wraxall's analysis yielded results which contradicted the state's expert and were favorable to defendant.

The habeas corpus petition alleges, inter alia, that trial counsel's failure to present Wraxall's report constituted ineffective assistance of counsel; that counsel's failure to file a *Hitch* motion (*People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361]) when (falsely) informed that Wraxall's tests yielded no results constituted ineffective assistance of counsel; and that in any event the postjudgment disclosure of Wraxall's report constitutes newly discovered evidence requiring a new trial. (*In re Hall* (1981) 30 Cal.3d 408 [179 Cal.Rptr. 223, 637 P.2d 690].) We issued an order to show cause on this petition and ordered that it be consolidated with defendant's appeal.

Because we have concluded that the judgment of conviction must be reversed on another ground (see discussion, *infra*), we need not reach the issues raised in defendant's habeas corpus petition.

[8] As discussed later in the opinion (*post* at , pp. 1132-1135) the existence of the fingerprint on the business card did not come to light until well after the trial had started, and generated a protracted debate over its authenticity and the reasons for its belated disclosure. After an extended hearing, the trial court admitted the evidence.

B. *Defense Case*

Defendant called Kenneth Austin, a truck driver, who testified that on June 12, 1980, at approximately 2:15 a.m. he was driving southbound on Industrial Boulevard when he saw a brown, Chrysler-type sedan parked on the shoulder of the northbound lane less than a mile from the site where Mead's body was found. He stated that he saw a male with long, light colored hair and a female standing by the car. Both Zeller and Pfeiffer had blond hair, which each claimed was fairly short in June 1980.

Defendant testified in his own behalf. He stated that he was at home in Sacramento, where he lived with his parents and three brothers, on the evening of the murder. His brother, Fredrick, left the house about midnight. Defendant left somewhat later, after consuming marijuana and alcohol, and headed for the home of his friend, Kevin McGruder. Defendant hoped to obtain a ride from McGruder to his girlfriend's apartment in Marysville. As he approached McGruder's house, he saw a vehicle departing from the vicinity of the Graham residence. Moments later, he saw two sheriff's vehicles approach and, fearful of arrest for public drunkenness, jumped the fence and landed in the Grahams' backyard. He went into the Grahams' garage through a side door to hide. To avoid detection, he proceeded into the Graham residence. He walked through the house and observed that it had been ransacked. No one else was present. A short time later, he left through the garage and saw a bag with ammunition on top. The other property recovered from French's apartment was apparently underneath. While in the garage, he heard a car drive up, heard the sound of a door close, and then heard the car leave. Defendant then took the bag and left. He noticed that the keys were in the ignition of Mead's car in the driveway and decided to take the car.[9] Inside the car he found a Texaco credit card and Fred Graham's gun. He denied that he took the credit card or the Stoney Ridge business card which contained his fingerprint from Mead's purse. He admitted that he took the CB radio, the other items from the Graham residence and the revolver to French's Marysville apartment. He denied that he told anyone to stop crying or threatened to "86" anyone. He denied that he had raped, robbed, kidnapped or murdered Heather Mead.

2. *Penalty Phase*

The prosecution submitted the question of penalty on the evidence presented at the guilt phase.

Defendant testified briefly regarding his somewhat peripatetic childhood as the son of an Air Force employee. He stated that he was 21 years old,

---

[9] A friend of Mead's testified that Mead sometimes left her keys in the ignition.

had no prior felony convictions, had not graduated from high school and had worked for a year as a dishwasher at a Sacramento hotel. He stated that he was not a violent person by nature. No other evidence was presented in aggravation or mitigation.

DISCUSSION

I.

*The Trial Court Erred Prejudicially in Denying Defendant's Change of Venue Motions*

As noted earlier, the trial court denied a joint pretrial motion for change of venue made by defendant and his then codefendant, his brother, Fredrick Williams. The court subsequently denied defendant's renewed motion for change of venue during jury selection. We have concluded the denial of defendant's renewed motion was prejudicially erroneous.[10]

All of the critical factors, as we observed in his brother's case, "strongly indicate[d] that a change of venue [was] necessary to insure that . . . defendant receive a fair trial . . . . [T]he effect of the extensive pretrial publicity is less likely to subside in a small community such as Placer County; the crime was of a sensational nature; the offenses charged [were] grave and carr[ied] severe penalties; and defendant [was] friendless in a community in which the victim enjoyed a certain, even if limited, prominence." (*Williams v. Superior Court, supra,* 34 Cal.3d at p. 595.)[11]

Though the Attorney General is correct in pointing out that the publicity preceding defendant's brother's trial date was more extensive than that preceding defendant's—owing to the fact that defendant was tried first—the evidence in support of defendant's motion was in other respects *more* compelling. As set forth below, the penalty facing defendant was more severe (the district attorney indicated that he did not intend to seek the death penalty against defendant's brother); the pretrial publicity had identified defendant rather than his brother as the actual "triggerman"; and the jury voir dire in defendant's trial corroborated what could only be speculated about in his brother's case (because he had sought a writ prior to jury selection)—that the local community was too familiar with the crimes, the

---

[10] Although the venue issue was raised and argued on appeal by defendant's retained counsel, who had also served as defendant's trial counsel, our decision is based primarily upon the arguments set forth in the brief filed by the California Appellate Project and upon our own independent review of the record. Appellate counsel's brief and oral argument were singularly unhelpful.

[11] Unlike his brother, Fredrick, defendant did not seek a writ of mandate to compel the trial court to change venue.

victim and her family, the district attorney and the prosecution witnesses, to permit the trial to proceed there.

## 1. *The Law*

■ The salient principles on review of a motion for change of venue were well summarized in *People* v. *Harris* (1981) 28 Cal.3d 935 [171 Cal.Rptr. 679, 623 P.2d 240]: "A change of venue must be granted when the defendant shows a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. (*People* v. *Welch* (1972) 8 Cal.3d 106, 113 [104 Cal.Rptr. 217, 501 P.2d 225]; *Frazier* v. *Superior Court* (1971) 5 Cal.3d 287, 294 [95 Cal.Rptr. 798, 486 P.2d 694]; *Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 383 [66 Cal.Rptr. 724, 438 P.2d 372].) Whether raised on petition for writ of mandate or on appeal from judgment of conviction, the reviewing court must independently examine the record and determine de novo whether a fair trial is or was obtainable. (*People* v. *Welch, supra*; *People* v. *Tidwell* (1970) 3 Cal.3d 62, 68-69 [89 Cal.Rptr. 44, 473 P.2d 748]; *Maine* v. *Superior Court, supra,* 68 Cal.2d at p. 382.) The factors to be considered are the nature and gravity of the offense, the nature and extent of the news coverage, the size of the community, the status of the defendant in the community, and the popularity and prominence of the victim. (*People* v. *Salas* (1972) 7 Cal.3d 812, 818 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832].)" (*Id.* at p. 948; see also *Odle* v. *Superior Court* (1982) 32 Cal.3d 932, 937 [187 Cal.Rptr. 455, 654 P.2d 225]; *Martinez* v. *Superior Court* (1981) 29 Cal.3d 574, 577-578 [174 Cal.Rptr. 701, 629 P.2d 502].)

Of course, the question presented on appeal from a judgment of conviction is necessarily different from that on a petition for writ of mandate. " 'A significant difference between pretrial and posttrial review is that after conviction in determining whether a defendant received a fair and impartial trial under the "reasonable likelihood" standard, the review is *retrospective.* . . .' In other words, voir dire may demonstrate that pretrial publicity had no prejudicial effect," or conversely may corroborate the allegations of potential prejudice. (*People* v. *Harris, supra,* 28 Cal.3d at p. 949, quoting *People* v. *Martinez* (1978) 82 Cal.App.3d 1, 13 [174 Cal.Rptr. 701, 629 P.2d 502], original italics; *People* v. *Tidwell* (1970) 3 Cal.3d 62, 73-74 [89 Cal.Rptr. 44, 473 P.2d 748].)

■ Put differently, because the prejudicial effect of publicity before jury selection is necessarily speculative, it is settled that " 'any doubt as to the necessity of removal . . . should be resolved in favor of a venue change.' " (*Williams* v. *Superior Court, supra,* 34 Cal.3d at p. 588.) After trial, any presumption in favor of a venue change is unnecessary, for the matter may then be analyzed in light of the voir dire of the actual, available jury pool and the actual jury panel selected. The question then is whether, in light of

the failure to change venue, it is reasonably likely that the defendant in fact received a fair trial. (*People* v. *Balderas* (1985) 41 Cal.3d 144, 177 [222 Cal.Rptr. 184, 711 P.2d 480].)

Whether raised on petition for writ of mandate or on appeal from a judgment of conviction, however, the standard of review is the same. A showing of actual prejudice "shall not be required." (*Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 383 [66 Cal.Rptr. 724, 438 P.2d 372]; accord *Martinez* v. *Superior Court, supra,* 29 Cal.3d at p. 578; *Odle* v. *Superior Court, supra,* 32 Cal.3d at p. 937.) In a pretrial motion for change of venue, defendant need only demonstrate a "reasonable likelihood" that absent such relief a fair trial cannot be had. (*People* v. *Welch* (1972) 8 Cal.3d 106, 113 [104 Cal.Rptr. 217, 501 P.2d 225].) On appeal after judgment, the defendant must show a reasonable likelihood that a fair trial was not had. (*People* v. *Adcox* (1988) 47 Cal.3d 207, 231 [253 Cal.Rptr. 55, 763 P.2d 906]; *People* v. *Harris, supra,* 28 Cal.3d at pp. 948-949.) In either case, "[t]he phrase 'reasonable likelihood' denotes a lesser standard of proof than 'more probable than not.' " (*Martinez* v. *Superior Court, supra,* 29 Cal.3d at p. 578, quoting *Frazier* v. *Superior Court* (1971) 5 Cal.3d 287, 294 [95 Cal.Rptr. 798, 486 P.2d 694]; accord *Odle* v. *Superior Court, supra,* 32 Cal.3d at p. 937.)

2. *Application of the Law to the Facts*

A. *Pretrial Publicity*

 With the foregoing principles in mind, we have carefully examined the record to determine the potential for prejudice from pretrial publicity. Our review persuades us that all of the relevant analytical factors, viewed not only in isolation but in relation to one another, compelled a change of venue in this matter.

Placer County is a relatively small county by California standards; at the time of defendant's trial, the population was approximately 117,000; Blacks numbered about 402, or approximately 0.4 percent of the total population. Yet despite its small population, Placer County is well served by the local press. As we noted in *Martinez* v. *Superior Court, supra,* 29 Cal.3d 574, a capital murder case in which we also ordered a change of venue from Placer County, the circulation of the three main newspapers at that time (one year before the instant matter) covered at least half of the potential jurors in the county. (*Id*. at p. 579, fn. 1; see also *Williams* v. *Superior Court, supra,* 34 Cal.3d at p. 589, fn. 3.) Indeed, as explained more fully below, the jury voir dire revealed that community awareness of this case was especially widespread.

The newspaper and radio stories submitted in support of defendant and his brother's joint motion for change of venue demonstrated extensive, sometimes inflammatory pretrial publicity. More than 50 newspaper and radio reports appeared during the 9-month period between defendant's arrest and motion. Articles appeared every month during this period (with the exception of November and December of 1980). Although the coverage was most extensive during the months of June and July 1980, it remained continuous thereafter. Nearly every item contained a short description of the murder and identified defendant and his brother as suspects. Many of the reports were front-page or lead articles.[12]

The nature of the newspaper reports was frequently sensational. The victim's "bullet-riddled" body was referred to several times; the slaying was described as "execution style" on at least four occasions; nearly every article reported that the victim had been raped; it was reported that authorities believed the victim had been "executed" so that she could not identify her assailant. Indeed, we recently contrasted the tragic if relatively unsensational killing in *People* v. *Adcox, supra,* 47 Cal.3d 207, with the crimes in this very case (as described in *Williams* v. *Superior Court, supra,* 34 Cal.3d 584), which we characterized as "involving sensational racial [and] sexual overtones." (*Id.* at p. 232.)

Later news reports also focused on preliminary hearing evidence and sheriff's statements indicating that defendant was the actual "triggerman" and rapist, and was therefore being held without bail, while his brother's bail was set at $50,000 and later reduced to $10,000. The local press also reported that defendant had made statements which were inadmissible due to a "Miranda violation," but which nevertheless exonerated his brother. (See *People* v. *Tidwell, supra,* 3 Cal.3d at p. 68 [statement by the defendant's brother implicating defendant at least as damaging as report that defendant had confessed].) In short, as we said of a similar situation in *Martinez,* "The net effect of the coverage was to suggest to the persons who were potential jurors in the trial of his case the probability that petitioner was the actual killer." (*Martinez* v. *Superior Court, supra,* 29 Cal.3d at p. 580.)

The Attorney General nevertheless discounts the potential impact of the pretrial publicity on the ground that the frequency of the articles decreased after the first two weeks of defendant's arrest. The argument overlooks three facts. First, as noted earlier, the publicity did not cease but continued

---

[12] Media coverage of the murder was most intense during the month of June, when at least 20 newspaper articles appeared. Thereafter, media coverage continued on a fairly regular basis as events unfolded; defendant's preliminary hearing in July resulted in at least five additional articles and several radio and television reports; his brother's preliminary hearing in September generated another seven articles. The brothers' pretrial motions for severance and change of venue during the months of January and February also generated at least five additional articles and supplemental television and radio coverage.

at a fairly steady pace until the start of trial. (See *Williams* v. *Superior Court, supra,* 34 Cal.3d at p. 589, fn. 3.)[13] Second, as discussed below, jury selection revealed that, in fact, community awareness of the crime remained quite high. ██ And third, as we have frequently observed, the passage of time does not necessarily have the same tendency to dissipate the effects of pretrial publicity in a small community that it might otherwise have in a large venue. (See, e.g., *Maine* v. *Superior Court, supra,* 68 Cal.2d at p. 387 ["Delays may be an efficacious antidote to publicity in medium-size and large cities, but in small communities, where a major crime becomes embedded in the public consciousness, their effectiveness is greatly diminished"]; accord *People* v. *Harris, supra,* 28 Cal.3d at p. 949.)

None of the foregoing, of course, is conclusive evidence that the community was aroused to an emotional fever pitch. It is not necessary, however, that defendant demonstrate overt hostility. ██ As we have explained, " 'When a spectacular crime has aroused community attention and a suspect has been arrested, the possibility of an unfair trial may originate in widespread publicity describing facts, statements and circumstances which tend to create a belief in his guilt.' " (*Martinez* v. *Superior Court, supra,* 29 Cal.3d at p. 580, quoting *Corona* v. *Superior Court* (1972) 24 Cal.App.3d 872, 877 [101 Cal.Rptr. 411]; accord *Williams* v. *Superior Court, supra,* 34 Cal.3d at p. 590; *People* v. *Tidwell, supra,* 3 Cal.3d at p. 70.) Clearly this was the import of the extensive pretrial publicity in this case.

██ The pervasiveness of the news coverage was corroborated during jury selection. Of the 116 prospective jurors questioned, 61, or approximately 52 percent, had read or heard of the case.[14] Of these, only 10 were excused for cause on the ground that they could not disregard their opinion, formed on the basis of news reports, that defendant was guilty. *Eight* of the twelve jurors ultimately seated had read or heard of the case.[15]

---

[13] The Attorney General correctly notes that the publicity in defendant's brother's case was more extensive than here, primarily because of the additional news coverage generated by defendant's protracted trial. Indeed, we cited the publicity given defendant's trial as the strongest factor militating in favor of Fredrick's change of venue motion. (See *Williams* v. *Superior Court, supra,* 34 Cal.3d at p. 591.) Nevertheless, the nature of the pretrial publicity in this matter was no less intense, and, as voir dire proved, no less likely to become embedded in the public mind. Indeed, because his brother's case was decided by writ of mandate prior to jury selection, the evidence of potential jury bias in that case was not as persuasive as here.

[14] These figures are based upon our independent review of the record. The figures cited by the Attorney General differ slightly (64 of 131 jurors, or 49 percent, expressing some familiarity with the case), apparently as the result of including alternate jurors in the data.

[15] The testimony of one potential juror ultimately excused for cause provides a revealing insight into the impact of defendant's case on the local community. Under questioning by the court, Mr. C., a mailman in Roseville, acknowledged that he had read about the case and stated that he had discussed it with many of the residents on his delivery route. "I heard of it a lot when I was on my route. [¶] Other people would address me with it (*sic*), and we would just talk, and a routine thing . . . [¶] I travel around the street, and I probably talked about it

It is true, of course, that exposure to pretrial publicity does not automatically indicate prejudice. (See *Irvin* v. *Dowd* (1961) 366 U.S. 717, 722-723 [6 L.Ed.2d 751, 755-756, 81 S.Ct. 1639]; *People* v. *Harris, supra,* 28 Cal.3d at p. 950.) Indeed, the trial court in this matter was careful to inquire into each juror's prior knowledge, and most attested that they could render an impartial verdict. A juror's declaration of impartiality, however, is not conclusive. (*Irvin* v. *Dowd, supra,* 366 U.S. at p. 728 [6 L.Ed.2d at p. 759]; *People* v. *Tidwell, supra,* 3 Cal.3d at p. 73.) To be sure, perfection is not required; some knowledge of the case on the part of some jurors is often unavoidable. Here, however, a brutal murder had obviously become deeply embedded in the public consciousness (half of the jurors questioned knew something about the case). Thus, it is more than a reasonable possibility that the case could not be viewed with the requisite impartiality. (*People* v. *Tidwell, supra,* 3 Cal.3d at pp. 73-76; *Maine* v. *Superior Court, supra,* 68 Cal.2d at p. 387.)

### B. *The Status of the Victim and the Accused*

Clearly, the nature and extent of the pretrial publicity in this case militated in favor of a change of venue. Equally or perhaps even more compelling, however, was the relative status of the victim and the defendant in the community. As we observed in *Tidwell,* "When the significance of associations between victims or witnesses and the jurors who actually determined defendant's fate is explored, the impossibility of an impartial adjudication of defendant's guilt and selection of penalty becomes obvious." (*People* v. *Tidwell, supra,* 3 Cal.3d at p. 73.)

Aside from the stark brutality of the offenses, the pretrial publicity focused heavily on the fact that the victim was a Placer County resident and the defendant was an outsider. Most articles described the victim as a young "Roseville woman" and defendant as a "Sacramento man." There were racial overtones as well. The suspect was initially reported as a young "negro male"; his picture appeared in the local press. The victim was a young, White local woman. As we noted in defendant's brother's case, the social, racial and sexual overtones were precisely the kind which could "most effectively prejudice" defendant. (*Williams* v. *Superior Court, supra,* 34 Cal.3d at p. 594.)

Moreover, though the victim, Heather Mead, was herself not especially prominent, she came from an extended family with long and extensive ties to the community. (See *Williams* v. *Superior Court, supra,* 34 Cal.3d at p. 593 [Mead's "family has prominence in the community, while the defend-

---

50 times to people. Old people and so forth." Mr. C. also indicated that although he did not know the victim personally, clerks in the post office had told him "how nice a person she was."

ant is but a stranger . . ."].) Of the 250 potential jurors, some 35 indicated that they knew the victim, members of her family, or her boyfriends. Of these, only six were excused for cause. By contrast, not a single potential juror knew the defendant.[16]

The number of potential jurors acquainted with the district attorney and one or more of the prosecution witnesses was even more striking. Some 23 indicated that they knew the district attorney and 8 others knew either the trial deputy or investigators; 14 additional jurors indicated that they knew 1 or more of the Placer County deputy sheriffs who were to testify. None indicated that they knew anyone associated with the defense. While such acquaintance with persons involved in the prosecution would not necessarily disqualify a juror, it is a factor that cannot be ignored.

Thus, in addition to the one-half who were already familiar with the case, better than one-third of the jury pool knew someone directly associated with the prosecution. Only a dozen were excused for cause on this ground. Not surprisingly, defendant easily exhausted his 26 peremptory challenges. (Cf. *People* v. *Balderas, supra,* 41 Cal.3d at p. 180 [defendant used only 13 of 26 peremptory challenges, suggesting "that the jurors were fair, and that the defense itself so concluded."].)

Of the twelve jurors ultimately seated, two-thirds had read or heard of the case. In addition, 3 of the 12 had family members who worked for Placer County law enforcement agencies. One had a brother who was a Placer County Deputy Sheriff. Another juror's father had been a "constable" in Roseville for over 50 years. And a third juror's husband performed medical forensic work for the county. Two of the jurors revealed that they were personally acquainted with the district attorney. One disclosed that the district attorney was "a friend of . . . [her] father's"; she stated that she knew the district attorney "well enough to speak to when . . . [she] see[s] him." Another juror explained that he and the district attorney occasionally ate lunch together at a local service club.

These numbers, while striking in themselves, are more significant for the intangibles they convey. As we observed in *Tidwell,* the fact that jurors are acquainted with trial participants "infects the whole process of guilt adjudication." (3 Cal.3d at p. 74.)

This is not to say, of course, that serious and even "sensational" crimes cannot be fairly tried in smaller communities. However, where, as here, the victim is a local woman from a prominent family, the district attorney and

---

[16] The Attorney General counts only 12 jurors who knew the victim or her close friends and family, but apparently overlooks the significant number who knew the victim's stepfather, Woody Heldt, who owned a prominent local stable, the stepfather's daughter by another marriage, the victim's aunt and uncle, and the victim's boyfriends.

the prosecution witnesses are all well known, and the accused—representing the quintessential "other" in both a geographic and racial sense—is charged with crimes bearing both sexual and racial overtones, the risk is enormously high that the verdict may be based on a desire for revenge, or the fear of social ostracism as the cost of a mitigated verdict. In such circumstances, as we observed in *Tidwell,* "the juror may consider himself honored and fortunate to be selected to culminate a community's anger against a stranger accused of killing [a] respected member[ ] of that community, [and] returning anything less than a death verdict for first degree murder might be viewed as a betrayal of both his trust as a juror and his friendship with witnesses [or the prosecution]. When a juror might reasonably fear that the cost of a mitigated verdict might be . . . the alienation of an entire community, there is a danger that such fears will play a part in his deliberations." (3 Cal.3d at pp. 74-75.)

### C. *The Nature and Gravity of the Offense*

All of the factors discussed above are exacerbated by the fact that defendant was charged with an exceptionally brutal slaying, and faced the gravest of punishments. ■ It is well settled that in capital cases "the factor of gravity must weigh heavily in a determination regarding the change of venue." (*Martinez* v. *Superior Court, supra,* 29 Cal.3d at p. 583; accord *Odle* v. *Superior Court, supra,* 32 Cal.3d at p. 941; *Williams* v. *Superior Court, supra,* 34 Cal.3d at p. 593.)

Where the jury in its discretion is responsible for determining whether a defendant *lives or dies,* the need for juror impartiality is obviously most acute. The United States Supreme Court has properly insisted that evidence relating to the individual character and background of a defendant must be admissible during the penalty phase, so as to maximize the jury's opportunity to see the defendant as a human being, with human frailties, and not merely as a dehumanized stranger. (See *Woodson* v. *North Carolina* (1976) 428 U.S. 280, 304-305 [49 L.Ed.2d 944, 961-962, 96 S.Ct. 2978] (plur. opn. of Stewart, J.); *Turner* v. *Murray* (1986) 476 U.S. 28, 33-37 [90 L.Ed.2d 27, 34-37, 106 S.Ct. 1683].) ■ In this case the risk was unacceptably high that the jury would treat defendant—"a young black man, a stranger to and friendless in the community" (*Williams* v. *Superior Court, supra,* 34 Cal.3d at p. 594)—as a dehumanized stranger.

We conclude that, given the size of Placer County, the nature of the crimes and the relative status of the victim and defendant in the community, the trial judge should have granted a change of venue when presented with a showing of extensive pretrial publicity, and when the jury selection process later corroborated the prospective jurors' widespread familiarity with the crime, the victim, the district attorney and the prosecution wit-

nesses. At the very least there was a reasonable likelihood that defendant did not receive a fair and impartial trial. Hence, the judgment of conviction must be reversed.

II.

*Remaining Evidentiary Issues*

Our conclusion that the judgment must be reversed on account of the failure to grant a change of venue renders it unnecessary to pass on defendant's remaining arguments. For the guidance of the trial court in the event of a retrial, however, we shall address defendant's several contentions concerning the admissibility of evidence.

### 1. *The Admission of Fingerprint Evidence*

#### A. *Factual Background*

Defendant contends that certain fingerprint evidence admitted at trial did not meet the chain-of-custody requirements set forth in *People* v. *Riser* (1956) 47 Cal.2d 566 [305 P.2d 1], overruled on other grounds in *People* v. *Morse* (1964) 60 Cal.2d 631, 649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810] for two reasons: (1) the police investigators were negligent in the collection, processing and comparison of the evidence and later committed perjury to cover up their mistakes, and (2) the trial court misapplied the law in ruling on the custody question.[17]

There is no doubt that the evidence in question was mishandled. Prior to trial, the prosecution informed defense counsel that it had not identified defendant's fingerprints on any items in the Graham house. Trial commenced in July 1981. By the trial recess in August, the prosecution had introduced evidence which showed that defendant possessed items stolen from the Graham residence. The only evidence that actually placed defendant at the scene of the murder, however, was McGruder's testimony that he thought he heard defendant's voice in the Graham house—and that testimony had been effectively impeached.

The situation changed dramatically when the prosecutor disclosed during the August recess that a fingerprint of the defendant had been identified on a "Stoney Ridge" business card found in the Graham residence during the initial investigation in June 1980, 14 months earlier. Trial counsel objected to the card's admission on the grounds that it appeared to have been suppressed for over a year and might have been tampered with. Defense coun-

---

[17]Defendant also contends that the midtrial admission of the evidence resulted in substantial prejudice. We need not reach this contention.

sel also claimed that he had relied to his prejudice on the prosecutor's representation that none of the items in the house contained defendant's fingerprints. After an extended hearing, the trial court admitted the evidence.

Four employees of the Sacramento County sheriff's department and a fingerprint analyst for the Justice Department were called by the prosecution to testify at the hearing. Dennis Hill, a sheriff's department fingerprint analyst, testified that he found the card on the kitchen floor of the Graham residence and placed it in a bag along with other items seized from that location. Hill stated several times that he had "a distinct recollection" of having retrieved the card from the kitchen floor.

Following Hill's testimony, however, the prosecution apparently discovered a photograph of the crime scene which showed the Stoney Ridge card lying on a bed in the Graham residence. Thereafter, Hill was recalled to the stand and totally changed his testimony. He stated that earlier he had merely "assumed" he found the card in the kitchen because it was in the bag with the other items seized from that location. His new position was that he could not specifically recall finding the card in the kitchen or anywhere else in the house.

Michael Kidwell, another employee of the sheriff's department, processed the evidence taken from the Graham residence for fingerprints. Kidwell testified that he took a photograph of the latent fingerprint on the Stoney Ridge business card. He conceded that it was possible he had inadvertently commingled the contents of the separate bags containing evidence from the bedroom and the kitchen. To have done so, however, would have been contrary to his standard practice, and Kidwell stated that he had no independent recollection of having commingled the contents of the bags.

Photographs of all of the latent fingerprints in the case were forwarded to John Allen, another analyst, for comparison with exemplars from defendant, his brother Kenneth Williams, and others who may have been in the Graham residence. The photographs were sent in seven separate envelopes. The Stoney Ridge business card was contained in the seventh envelope. Allen stated that he completed the comparison of the photographs in the first six envelopes in June 1980. He received the seventh envelope sometime later, but was then unable to locate the exemplars to do the comparisons. Although Allen eventually compared the photographs in the seventh envelope with exemplars from Rod Zeller and Jeff Kearney in October 1980, and with exemplars from Bruce Pfeiffer, Fred and Bettie Graham and the victim in February 1981, for some inexplicable reason he never compared the photograph of the print on the card with exemplars of *defendant's* fingerprints. Allen further stated that he did not realize his mistake until he

reviewed the evidence during the trial recess in August 1981. He then made the comparison and discovered that the print in the photograph of the business card matched defendant's exemplar.

Angelo Rienti, a fingerprint analyst for the Department of Justice, testified that because of fading it was not possible to determine whether the actual latent fingerprint on the business card matched defendant's exemplar, but confirmed that the print in the photograph of the card was identical to defendant's. Rienti stated that it is possible under ideal conditions to use a person's fingerprint exemplar to place a print on another surface, but it did not appear to him that such tampering had occurred in this case.

The trial court ruled that a sufficient "prima facie" showing of relevancy and chain of custody had been made to admit the fingerprint evidence. At defense counsel's suggestion, however, the court instructed the jurors that they could consider the evidence only if they found (1) that the business card which contained the fingerprint had been found and seized at the Graham residence, (2) that the fingerprint on the card was defendant's, and (3) that "even if the prosecution has failed to establish a continual chain of possession of the item from the time of its initial seizure to presentation in court, the prosecution has nevertheless shown beyond a reasonable doubt and to a moral certainty that there was no alteration of offered evidence."

### B. *Discussion*

Defendant contends that in view of these facts the prosecution failed to establish a continuous chain of custody, a necessary foundation for the admission of demonstrative evidence. ■ The rules for establishing chain of custody were set forth in the seminal case of *People v. Riser, supra,* 47 Cal.2d 566: "The burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration. [¶] The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. [Citations.] Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight." (*Id.* at pp. 580-581.)

■ In the present case the prosecution was unable to explain satisfactorily two anomalies in the facts and circumstances of the handling of the fingerprint evidence in question. First, the evidence concerning the card's location in the Graham residence was inconsistent: the photograph placed it

in the bedroom, yet the evidence bag in which it was contained came from the kitchen. Dennis Hill's inconsistent testimony made the circumstances seem even more suspicious. Nevertheless, defendant adduced no evidence that the card itself had been tampered with or that another card had been substituted in its place. As the trial court observed, whether originally seized from the bedroom or the kitchen, the evidence showed that the card was "from the house, that's the overwhelming significance in this case."

The second anomaly surrounding the evidence was the prosecution's inexplicable failure, until midtrial, to compare the latent fingerprint on the card with defendant's exemplar. There was no evidence, however, of prosecutorial bad faith or suppression of the evidence. Moreover, there is nothing in the record to suggest that the belated disclosure resulted in the denial of a fair trial. (*People* v. *Ruthford* (1975) 14 Cal.3d 399, 406-407 [121 Cal.Rptr. 261, 534 P.2d 1341, A.L.R.4th 3132].) We conclude that the evidence was properly admitted.

Defendant also contends that the trial court applied an erroneous standard in ruling on the admissibility of the evidence and in permitting the jury to determine its relevance. The contentions are without merit. "[W]hen it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight." (*People* v. *Riser, supra,* 47 Cal.2d at p. 581.) Notwithstanding the prosecution's errors in the handling of the evidence, the trial court properly concluded that the prosecution had made at least a prima facie showing that the evidence had not been tampered with. Therefore, the trial court did not err in admitting the evidence, permitting the jury to hear all of the facts and circumstances surrounding its discovery and disclosure, and requiring the jury to find beyond a reasonable doubt that the card had not been tampered with before considering it.

## 2. *Inspector Smith's Opinion Testimony on Rape*

Defendant contends that the trial court erred in permitting Inspector Smith to give expert opinion testimony on certain aspects of rape.

During the prosecution's case-in-chief and during the defense case, the defense established that there were no marks on defendant's body following the commission of the rape and homicide. During the People's rebuttal, the trial court permitted Inspector Smith to testify, over objection, that during his 17 years of experience with the police he had investigated approximately 100 rape cases and that in his opinion "there [was] really nothing unusual about the fact that a defendant would not have any marks upon his body following a sexual assault or a rape of a female victim." Smith went on to

testify, over objection, that he "base[d]" his opinion in part "on the emotional make-up of the female victim," and "how the woman herself feels she should react under given circumstances . . . ."

■ Defendant contends that Inspector Smith's background and experience were insufficient to permit him to testify, as an expert on rape, that in his opinion it was not "unusual" for a rapist's body to be unmarked. The contention lacks merit.

"We are required to uphold the trial judge's ruling on the question of an expert's qualifications absent an abuse of discretion. [Citation.] Such abuse of discretion will be found only where ' "the evidence shows that a witness *clearly lacks* qualification as an expert." ' " (*People* v. *Chavez* (1985) 39 Cal.3d 823, 828 [218 Cal.Rptr. 49, 705 P.2d 372], original italics.) In view of Inspector Smith's unchallenged experience in investigating approximately 100 rape cases, the trial court's ruling that Inspector Smith was qualified to testify that it is not unusual for a rapist to be unmarked after the offense, was not an abuse of discretion.

Defendant also contends that the trial court erred in permitting Inspector Smith to testify that the "emotional make-up" of the victim is a factor which may affect whether the rapist will have any marks on his body. The contention has merit. ■ " 'The competency of an expert is relative to the topic and fields of knowledge about which the person is asked to make a statement. In considering whether a person qualifies as an expert, the field of expertise must be carefully distinguished and limited.' " (*People* v. *Kelly* (1976) 17 Cal.3d 24, 39 [130 Cal.Rptr. 144, 549 P.2d 1240], quoting *People* v. *King* (1968) 266 Cal.App.2d 437, 445 [72 Cal.Rptr. 478].) Even assuming that expert testimony was admissible to show that rape victims react in a certain way based upon their "emotional make-up" (cf. *People* v. *Guthreau* (1980) 102 Cal.App.3d 436 [162 Cal.Rptr. 376] and *People* v. *Clark* (1980) 109 Cal.App.3d 88 [167 Cal.Rptr. 51]), there was no evidence that Inspector Smith had the requisite psychiatric training and experience to testify on such matters.

3. *Motion to Suppress Evidence*

Defendant contends that the trial court erred in denying his section 1538.5 motion to suppress evidence, based on his claim that the arrest was unlawful and therefore that all of the evidence seized at the time should be suppressed. He charges illegality on two theories. First, he contends that his arrest on a Sacramento County burglary arrest warrant was invalid because it was allegedly obtained as a pretext to obtain evidence pertinent to the homicide, because the affidavit in support of the arrest warrant failed to

establish probable cause, and because the affiant made false and misleading statements. Alternatively, defendant contends that the police lacked independent probable cause to arrest for the homicide.

The trial court ruled that the arrest was legal, both because the burglary warrant was valid and because there was probable cause to arrest for the homicide.

A. *The Facts*

The record of the section 1538.5 hearing reveals that Inspector Smith inspected the body of the victim shortly after it was discovered in the early morning hours of June 12, 1980. He observed a spent slug and bullet fragments at the scene and concluded that the victim had been shot at that location, possibly by a .38-caliber handgun. Relatives of the victim were contacted who informed Smith that she had been house-sitting for her aunt and uncle, the Grahams, in Sacramento. Officers questioned neighbors of the Grahams, including Kevin McGruder, that day as well as the next, June 13, 1980. From McGruder the police learned that defendant might have known the Grahams were on vacation, that McGruder had driven defendant's brother to the vicinity of the Graham residence, had heard defendant's voice inside the house within hours of the murder, and had called the police to report a disturbance.

On the evening of June 12, Inspector Smith learned from Fred Graham, who had just returned from holiday, that a .38-caliber revolver was among the items stolen from the residence. The following morning, June 13, 1980, Inspector Smith learned that the victim's car had been located in Marysville. Field questioning continued through the afternoon, including a follow-up interview with McGruder. About 5:30 p.m., Inspector Smith attempted to contact defendant, who lived with his parents about three-tenths of a mile from the Graham residence. Smith was then told by defendant's mother that she had not seen defendant since midnight of June 11, just hours before the murder. Mrs. Williams directed Smith to another residence where defendant had stayed in the past. The individuals at this location informed Smith that defendant had a girlfriend in Marysville, Tammy French. Smith then went to Marysville on the evening of June 13 and learned that the victim's car was parked within one to two blocks of French's residence. In Marysville, Smith rendezvoused with officers from the Sacramento County sheriff's office, who had simultaneously been putting together an affidavit for an arrest warrant based upon defendant's alleged involvement in two Sacramento burglaries a month earlier.

The officers then went to French's residence, knocked on the front door which was a common door to three apartments, and were permitted entry

by a young child into a common foyer. They immediately observed defendant peer over a balcony from upstairs and run into an apartment. The officers gave chase, located defendant in the dining room and placed him under arrest. Smith then asked Ms. French if they could speak in private. She led him into the bedroom, where he observed a CB radio on the floor and the other stolen property which defendant had left there the day before.

## B. *Discussion*

■ "As a general matter, '[a] peace officer may arrest a person without a warrant whenever he has reasonable cause to believe that the person arrested has committed a felony.' [Citations.] However, . . . article I, section 13, of the California Constitution and the Fourth Amendment of the federal Constitution prohibit warrantless arrests within the home, even upon probable cause, in the absence of exigent circumstances." (*People* v. *Campa* (1984) 36 Cal.3d 870, 878 [206 Cal.Rptr. 114, 686 P.2d 634]; see also *People* v. *Ramey* (1976) 16 Cal.3d 263, 270-277 [127 Cal.Rptr. 629, 545 P.2d 1333]; *Payton* v. *New York* (1980) 445 U.S. 573, 589-590 [63 L.Ed.2d 639, 652-653, 100 S.Ct. 1371].) The same constitutional protection extends to individuals sought to be arrested in someone else's private dwelling. (*People* v. *Tillery* (1979) 99 Cal.App.3d 975, 978-979 [160 Cal.Rptr. 650].)

■ " '[E]xigent circumstances' means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." (*People* v. *Ramey, supra,* 16 Cal.3d at p. 276.) Although the United States Supreme Court has not fully delineated the scope of the exigent circumstances exception, it has recognized the seminal case of *Dorman* v. *United States* (D.C. Cir. 1970) 435 F.2d 385 [140 App.D.C. 313] as "a leading federal case defining exigent circumstances . . ." in a warrantless arrest situation. (*Welsh* v. *Wisconsin* (1984) 466 U.S. 740, 751 [80 L.Ed.2d 732, 744, 104 S.Ct. 2091]; see *People* v. *Lanfrey* (1988) 204 Cal.App.3d 491, 508 [251 Cal.Rptr. 189].)

■ *Dorman* found the following factors relevant to a determination of exigent circumstances: "First, that a grave offense is involved, particularly one that is a crime of violence . . . [¶] Second, . . . that the suspect is reasonably believed to be armed. Delay in arrest of an armed felon may well increase danger to the community . . . [¶] Third, that there exists . . . a clear showing of probable cause . . . [¶] Fourth, strong reason to believe that the suspect is in the premises being entered. [¶] Fifth, a likelihood that the suspect will escape if not swiftly apprehended. [¶] Sixth, the circum-

stance that the entry, though not consented, is made peaceably." (435 F.2d at pp. 392-393; accord *People* v. *Lanfrey, supra,* 204 Cal.App.3d at p. 508; *United States* v. *Crespo* (2d Cir. 1987) 834 F.2d 267, 270; *United States* v. *Davis* (8th Cir. 1986) 785 F.2d 610, 615.) Both federal and California cases have found exigency where there was a threat that delay would result in the destruction of evidence. (*People* v. *Ramey, supra,* 16 Cal.3d at p. 276; *People* v. *Lanfrey, supra,* 204 Cal.App.3d at p. 508; *People* v. *Keltie* (1983) 148 Cal.App.3d 773, 779-780 [196 Cal.Rptr. 243]; *United States* v. *Davis, supra,* 785 F.2d at p. 615.)

■ All of the foregoing factors justified, indeed compelled, the warrantless arrest in this case. The crimes were vicious and violent. The suspect was quite clearly armed. The police had obtained trustworthy information pointing to defendant as one of the perpetrators. The proximity of the victim's car clearly suggested defendant's presence in the apartment, and also made flight a realistic possibility. The entry was peaceable. Moreover, the possibility that defendant might have learned from friends or family that the police were looking for him and might, as a result, dispose of any blood-stained clothing, stolen property or the murder weapon made arrest all the more urgent.

There was no unjustified delay by the investigating officers during which time an arrest warrant for the homicide could have been obtained. Inspector Smith's field investigation had been progressing steadily from the morning of the murder, on June 12, to the early evening of the 13th. At that point, as Inspector Smith testified, "everything [was] starting to . . . come together." Viewed as a whole, the circumstances confronting the officers were more than sufficiently urgent to justify a warrantless arrest of defendant in his girlfriend's apartment for the rape, robbery and homicide.

In view of the foregoing conclusion, we need not address defendant's alternative contention concerning the validity of the burglary arrest warrant.

## DISPOSITION

The judgment of conviction is reversed. The case is remanded to the Placer County Superior Court, and that court is directed to transfer the case to a proper court pursuant to California Rules of Court, rule 842, or to empanel a jury from another venue pursuant to the provisions of section 1036.7. In Crim. No. 24736 the order to show cause is discharged, and the petition for a writ of habeas corpus is denied.

Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., and Kennard, J., concurred.

**EAGLESON, J.**—I concur in the judgment insofar as it reverses the judgment of conviction and denies the petition for writ of habeas corpus. I dissent, however, from the remainder of the judgment which, on remand, directs the trial court to initiate proceedings to transfer the matter for retrial in another county.

The record supports the conclusion of the majority that the trial court erred in denying defendant's motion for change of venue, and the further conclusion that the error resulted in prejudice to the defendant's ability to select an impartial jury. In directing the trial court to transfer the case for retrial, however, the majority fail to recognize that this is all we decide when resolving an appellant's claim of error in denying a motion for a change of venue. We do not decide whether, assuming the defendant continues to desire a change of venue, there is presently evidence sufficient to warrant a change. (Pen. Code, § 1033, subd. (a).) Moreover, the majority forget that the error in denying the motion alone is not the basis for reversal of the judgment. It is the prejudicial effect of the error on defendant's *1981* trial that mandates reversal. (Cal. Const., art. VI, § 13; *People* v. *Bean* (1988) 46 Cal.3d 919, 942 [251 Cal.Rptr. 467, 760 P.2d 996]; *People* v. *Balderas* (1985) 41 Cal.3d 144, 178 [222 Cal.Rptr. 184, 711 P.2d 480]; *People* v. *Harris* (1981) 28 Cal.3d 935, 949 [171 Cal.Rptr. 679, 623 P.2d 240].) Neither the error in denying defendant's *1981* motion, nor its prejudicial impact at that time, however, speaks to whether defendant can obtain a fair trial in Placer County in *1989*.

By directing the trial court to transfer the case for retrial, the majority do more than reverse the judgment. They order the trial court to grant the motion regardless of whether a fair trial can now be held in Placer County. This order is contrary to the command of Penal Code section 1261, which directs: "*When a new trial is ordered it must be directed to be had in the court of the county from which the appeal was taken.*" (Italics added.)

The order also contravenes the express legislative intent that a ruling granting a motion for change of venue is subject to reconsideration if conditions in the county of original venue have changed prior to the actual transfer. Penal Code section 1036.5, while directed to the power of the trial court, reflects a policy with which the order of this court is inconsistent.

Penal Code section 1036.5 states: "Following the resolution of pre-trial motions, and prior to the issuance of an order under Section 1036 or the transmittal of the case file for the purpose of trial to the court to which venue has been ordered transferred, *the court may,* upon its own motion or the motion of any party and on appropriate notice to the court to which venue has been transferred, *set aside its order to change venue on the ground*

*that the conditions which originally required the order to change venue,* as set forth in Section 1033 or 1034, *no longer apply.*" (Italics added.) By directing the transfer, the majority nullify the authority of the trial judge to determine whether a fair and impartial trial can now be held in Placer County.

The majority offer neither authority nor explanation for this departure from the statutory command that the case be returned to Placer County or for the invasion of the trial court's prerogative to determine the proper venue.[1] Eight years have passed since the trial in this case. There is no reason to believe that the publicity which pervaded the community in 1981 has continued or will be renewed. The small size of a county should not give rise to a presumption that a defendant cannot obtain a fair trial in a publicized case, particularly one in which the interest of the media and the public may well have diminished by the time of trial. The assumption apparently underlying the belief of the majority that a transfer is necessary is particularly inapt in this case since Placer County is one of the fastest growing counties in the state and may now provide a fully adequate jury pool.[2]

I would reverse and remand without directions. (See Pen. Code, § 1262.)

---

[1] On remand to Placer County defendant would be free to renew his motion for change of venue, and the superior court free to evaluate it in light of contemporary conditions. The defendant's rights would, therefore, be fully protected.

[2] The estimated 1988 population of Placer County is 151,800, a substantial increase over the 1980 figure of 117,247. The projected population in 1990 is 167,568. (Horner (edit.), Cal. Cities, Towns, & Counties (1989) p. 481.)